HIGGINBOTHAM, J.
|2The defendant, Gary Thomas Gorman, was charged by bill of information with exploitation of the infirmed, a violation of La. R.S. 14:93.4. He pled not guilty and, following a jury trial, was unanimously found guilty as charged. The trial court sentenced the defendant to seven years imprisonment at hard labor. The defendant now appeals, designating the following seven assignments of error:
1) The trial court allowed the presently incompetent alleged victim to testify not under oath to display her present mental and physical condition to the jury over the defendant’s objection, which served no probative value and prejudiced the jury before it heard any evidence regarding the competency of the victim from the dates of August 1, 2009, to May 7, 2011;
2) After allowing the unsworn testimony of the alleged victim, the trial court informed the jury that her testimony was not to be considered as evidence of anything relevant, but also instructed the jury to. draw any inference about the *359 victim’s physical and mental infirmities as to the offense;
3) Defense counsel, although making an objection, was ineffective by not moving for a mistrial and failing to take emergency supervisory writs while allowing the trial to proceed with a tainted jury;
4) The trial court should have set aside the jury’s verdict of guilty because there is no evidence in the record that during the time frame in the indictment the alleged victim was incompetent, but was fully competent and functional;
5) While the trial court instructed the jury the alleged victim was incompetent, it allowed the introduction by the State of a revocation of the power of attorney previously given by the victim to the defendant during the period the State claimed she was incompetent. The State claimed the victim was incompetent from August 1, 2009, and fully incompetent after the last date in the indictment continuously to the present day. The trial court allowed testimony that the incompetent victim was competent on the date she signed with her brother the revocation which occurred during the time frame the State claimed she was incompetent;
6) La. R.S. 14:93.4 requires sufficient evidence to prove the defendant intentionally used, took property of the victim without express voluntary consent or use of fraud or use of the alleged victim’s power of attorney by use of fraud. The trial court prejudiced the jury by allowing the testimony of the alleged victim for the stated purpose of demonstrating her age; however, by instructing the jury that the victim was “incompetent” and allowing unsworn testimony, the trial court erred by unfairly and prejudicially instructing the jury the victim was incompetent and thereby, not only giving the prosecution an advantage or providing. less evidence • to the jury regarding the “incompetence” of the victim, but requiring the defendant to produce substantial evidence unfairly switching the burden of proof required for a conviction. Under either provision of proof “without express voluntary consent” or “power of attorney” by fraud, any evidence produced by the defendant was useless because of the prejudice of the jurors and errors of the trial court above;
|s7) Although the defendant was indigent, the trial court refused to determine same preventing any opportunity for him to file any motion for new trial, arrest of judgment, etc., despite these being clearly defined rights for all defendants.
For the following reasons, we affirm the conviction and sentence.

FACTS

In 2011, seventy-three-year-old Gloria (also known as “Nancy”) Cushing lived alone in her home in Watson, Louisiana. She had no children, and her husband, Arthur, had died in 1999. JoAnn Carr, Gloria’s sister and closest living relative, lived about 200 miles away from Gloria in West Carroll Parish. JoAnn often tried to get Gloria to move to north Louisiana to be with her since Gloria was alone without family and was having physical problems, including being legally blind.
The forty-one-year-old defendant, who was from Greenwell Springs, did some repair work on Gloria’s home following Hurricane Gustav in 2008. Over time, the defendant began visiting Gloria more often and they became friends. Based on the testimony contained in the record, it appears the defendant undertook somewhat of a caretaker role and began helping Gloria by checking in on her, driving her around, laying down newspaper on her *360 floors for her dog, and repairing damage to her home caused by fallen trees. Gloria became infatuated with the defendant and, for some reason, thought that she and the defendant were going to get married.
According to JoAnn, Gloria was having some cognitive difficulties, but after Arthur died, Gloria’s confusion and forgetfulness worsened. In February of 2009, Gloria was driving alone in Watson and wrecked her car. She suffered a severe head injury, broken arms, a broken leg, and broken pelvis. She was taken to a hospital in Zachary, then airlifted to Tulane Hospital, where she spent several weeks. She was moved from Tulane Hospital to Our Lady of the Lake Hospital, where she stayed for several weeks. From there, she was moved into Golden Age, a nursing home in Denham Springs. After several months in the nursing home, Gloria moved back to |4her home in Watson. Following the car accident, the defendant looked after Gloria more often. Gloria stayed in her home until May of 2011, but because of her progressively worsening mental and physical condition, she was admitted to Ochsner Hospital. From the hospital, Gloria went back to the nursing home briefly. Then in October of 2011, Gloria moved to north Louisiana to be with JoAnn.
Before Gloria made her final move out of her home in Watson, JoAnn discovered Gloria had been giving money and property to the defendant from late 2009 to mid-2011. In early 2010, JoAnn contacted Elderly Protective Services, which investigated the matter. It was discovered that in September of 2009, Gloria had a last will and testament drawn up, leaving everything to the defendant. Gloria also had a power of attorney executed in July of 2010, naming the defendant as her agent. Subsequently, Gloria revoked that power of attorney and had a new one drawn up. In December of 2009, Gloria donated the two lots of land she owned on either side of her Watson home to the defendant. Also in December of 2009, Gloria gave the defendant $132,000. In August of 2010, Gloria took out two reverse mortgages on her home and gave most of those proceeds, $80,000, to the defendant.
Dr. Durwin Walker, Gloria’s primary care doctor in Watson, testified that as early as December of 2009 (the first time he saw her after her car accident), Gloria had symptoms of dementia, which is a. progressive, declining condition involving the loss of intellectual and cognitive function. When Dr. Walker saw Gloria in March and June of 2010, he made a note about her dementia on both visits, and he noted that she had recently suffered a stroke.
Robin Hatheway, the defense’s expert in the area of registered nursing and psychiatric home care, testified that she reviewed Gloria’s medical records, including those records for Gloria’s home health care. Ms. Hatheway noted that when Gloria received home health care from August to October of 2009, the nurses did not make any notations of dementia, but did indicate “late effect cognitive | .^difficulties.” Ms. Hathe-way reviewed Dr. Walker’s records of Gloria’s office visit in December of 2009, wherein he noted dementia. When asked by defense counsel if she could tell from the doctor’s records what was meant by that, Ms. Hatheway replied, “No. Because he didn’t elaborate and he didn’t prescribe any medications for dementia, and that’s one of the things, if you get a diagnosis of dementia, you want to stop the progression of dementia.”
The defendant did not testify at trial.

ASSIGNMENT OF ERROR NO. 4

In his fourth assignment of error, the defendant argues the evidence was *361 insufficient to convict him. Specifically, the defendant contends there is no evidence that Gloria was incompetent during the relevant time frame, rather than being fully competent and functional.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. If viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt, then the defendant may be entitled to an acquittal. Accordingly, we proceed first to determine whether the entirety of the evidence, both admissible and inadmissible, was sufficient to support the conviction. See State v. Hearold, 603 So.2d 731, 734 (La.1992). See also Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La.Code Crim. P. art. 821(B); State v. Ordodi, 2006-0207 (La.11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.
Prior to the 2014 amendment,[1] La. R.S. 14:93.4 provided in pertinent part:
A. Exploitation of the infirmed is:
(1) The intentional expenditure, diminution, or use by any person, including a caregiver, of the property or assets of the infirmed, a disabled adult, or an aged person, including but not limited to a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility without the express voluntary consent of the resident or the consent of a legally authorized representative of an incompetent resident, or by means of fraudulent conduct, practices, or representations.
(2) The use of an infirmed person’s, or aged person’s, or disabled adult’s power of attorney or guardianship for one’s own profit or advantage by means of fraudulent conduct, practices, or representations.
The defendant asserts that the evidence was insufficient to prove Gloria was incompetent during the relevant time frame. This assertion, however, is the extent of the defendant’s argument. In the “Argument” portion of his brief, the defendant suggests the evidence was insufficient and that “there exists substantial and compelling exculpatory evidence showing [his] innocence.” Nowhere in the brief, however, does the defendant set out any law or, more importantly, any facts, as to why he thinks the evidence was insufficient or what constituted exculpatory 17evidence.
*362 The testimonial and documentary evidence established that between the ages of 71 and 73, Gloria was both aged and infirm. She was also legally blind. Additionally, Gloria was severely injured in the February 2009 car accident, where she was the driver and sole occupant. She suffered a head injury, broken limbs, and a broken pelvis in that accident. From the time of the accident onward, Gloria needed help ambulating, usually with the assistance of a walker. Dr. Walker testified that as early as December of 2009, Gloria was showing signs of dementia. Her mental state deteriorated as she experienced bouts of confusion and disorientation. Dr. Walker also noted that it appeared Gloria had suffered a stroke in 2010. Karen Marchand, a social worker who worked for Prime Care Home Health, testified that she visited Gloria several times at her house in 2011 and found her to be in “bad shape.” She testified that on one occasion when Gloria answered the door, she was home alone, wearing only a pajama top, and was otherwise naked. Her forehead was bleeding, and Ms. Marchand noted that Gloria was very confused, and did not know who she was. Ms. Marchand had concerns about Gloria’s mental capacity, especially after Gloria said that she and the defendant were in love and that they were getting married. During several home health visits in August through November of 2009, when Gloria was still living at her house, the visiting nurses made notes in the reports that Gloria exhibited confusion at times and continued to ramble about her boyfriend (the defendant); that she was forgetful, depressed, and disoriented, and that she was confused daily.
Gloria’s sister, JoAnn, testified that in 2008 or 2009 was the first time she ever heard about the defendant. JoAnn testified that Gloria told her that the defendant was wonderful, that he loved her and was going to marry her, and that she was going to get custody of the defendant’s children and help raise them. When JoAnn informed the defendant about these marriage ramblings, the defendant stated, “It is |swhat it is.” The defendant’s mother, Jean Gorman, testified at trial as a witness for the defendant. According to Jean, she never heard her son say he was going to marry Gloria, and he never gave any such impression; in fact, the defendant was seeing a woman from South America with whom he had a child.
To earn money, it appeared the defendant did construction work and other odd jobs. According to Jean and David Scott, a disabled worker who helped the defendant with his various jobs for many years, the defendant was involved in starting up or attempting to start up several businesses, including landscaping, a glass company, an asphalt paving company, a gravel trucking business, and a pig farm. Jean testified that she did the bookkeeping for some of the defendant’s businesses. According to Jean, if the defendant did not have the money for a business, he would borrow the money from Gloria. Jean maintained, however, that the defendant always paid Gloria back.
According to the testimony of several witnesses at trial, as well as to stipulations made between the parties, Gloria took out two home equity conversion mortgages (reverse mortgages) on her home in August 2010 even though, according to JoAnn, her house had been paid for. Gloria received from the bank for these mortgages $88,662, which was deposited into her bank account. About a week later, Gloria wrote two personal checks from that account made payable to the defendant. Each check was for the amount of $40,000. The defendant deposited these two checks into his personal account. According to Jean, the defendant borrowed that $80,000 from Gloria, but it was also an *363 investment for Gloria, in his gravel business. The defendant bought two gravel trucks with that money, even though he could not drive them due to his physical disability (spina bifida) and a back injury from an accident. Thus, he ended up selling the trucks.
Christina Delgado, an investigator with Elderly Protective Services, testified that Gloria told her that she had indeed taken out a mortgage for $80,000, but she 19lent the defendant only $6,000 to purchase some dump trucks. Gloria told Ms. Delgado that she had seen pictures of the trucks, and the defendant promised that he would repay her. There was no documentary evidence introduced at trial that indicated the defendant ever paid Gloria any amount for the alleged loan and/or investment. Gloria also donated two lots of land on either side of her house to the defendant. The defendant later sold the lots to third parties. Additionally, in December of 2009, Gloria gave the defendant $132,000. The defendant used Gloria’s credit cards to purchase items, including men’s clothes and children’s clothes. Gloria also had a last will and testament drawn up leaving everything to the defendant.
The testimony and other evidence clearly established that the defendant had taken large amounts of money from Gloria over a period of a few years. Despite the defendant’s alleged role as caretaker, much of this sufficiency of evidence determination was based on credibility determinations (for example, Jean’s testimony that the defendant took care of Gloria and never took advantage of her versus the testimony of JoAnn, as well as other witnesses, that the defendant provided minimal care for Gloria and preyed on her advanced age and mental condition to accumulate her money and property). Any juror could have rationally concluded that the defendant’s appropriations of Gloria’s possessions was an intentional diminution of her property or assets. Some testimony at trial suggested that the defendant took care of Gloria and helped make repairs on her house, including her roof; however, Gloria was not well, physically or mentally, and a trier of fact could have drawn the reasonable conclusion the defendant used her weakened state and susceptible elderly condition to take advantage of her. In any event, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Taylor, 97-2261 (La.App. 1st Cir.9/25/98), 721 So.2d 929, 932. Moreover, when there is conflicting testimony about factual matters, the resolution |10of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder’s determination of guilt. Id. We are constitutionally precluded from acting as a “thirteenth juror” in assessing what weight to give evidence, in criminal cases. See State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La.App. 1st Cir.1985). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
*364 When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See State v. Moten, 510 So.2d 55, 61 (La.App. 1st Cir.), writ denied, 514 So.2d 126 (La.1987). The jury heard all of the testimony and viewed all of the physical evidence presented to it at trial and, notwithstanding any conflicting testimony, found the defendant guilty. The jury’s finding of guilt reflected the reasonable conclusion that based on all of the evidence, the defendant took advantage of Gloria to her financial detriment. In finding the defendant guilty, the jury clearly rejected the defense’s theory of innocence. See Moten, 510 So.2d at 61. Moreover, in reviewing the evidence, we cannot say that the jury’s determination is irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662.
In After a thorough review of the record, we are convinced that "viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of exploitation of the infirmed. See State v. Calloway, 2007-2306 (La.1/21/09), 1 So.3d 417, 418 (per curiam).
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 1, 2, 5, and 6

The defendant has grouped these related assignments together because they all address the same argument. The defendant argues that the trial court erred in allowing the unsworn testimony of Gloria, who was declared to be incompetent by the trial court. The defendant contends that the unsworn testimony had no probative value, but was wholly prejudicial.
Following the testimony of Gloria’s sister, JoAnn, the State sought to put Gloria on the stand so that the jury could observe her condition. Defense counsel objected and suggested that if Gloria had dementia, then she would not be competent to testify; furthermore, according to defense counsel, allowing her to testify would be prejudicial because her condition at trial in 2013 had “nothing to do with what was going on in 2009 [and 2010].” The prosecutor countered that the jury was entitled to observe Gloria’s condition. Upon the prosecutor informing the trial court that Gloria had not been interdicted, the trial court briefly questioned Gloria to determine her state of mind.
The following colloquy and ruling by the trial court then took place:
Ms. Herbert [prosecutor]: Okay. Judge, there’s some things she knows and some things 'she doesn’t know as well. But, again, it corroborates what our theory is as far as the statute. It is different than your typical competency.
Mr. Betts [defense counsel]: Judge, my issue on that is they’re not trying to bring her in here to show the jury what she was like in '09 and 2010, they’re trying to — and this is horribly prejudicial—
11gThe Court: Well, that’s it, we get to the 403 balancing test. A) She’s alleged to be a victim. B) She’s a crucial witness for the State and yet may not be able to provide relevant and convincing testimony and yet, the jury’s entitled to see and evaluate her present conduct, knowing, of course, that she had a progressive disease. I’m going to overrule your objection and let her testify, Assignment is noted, objection is noted.
*365 The jury was then brought into the, courtroom. Defense counsel, asked the trial court to provide a limiting instruction to the jury. When the prosecutor called Gloria to the stand, the trial court gave the following instruction:
Ladies and gentlemen of thé jury, this witness is Gloria, also known as Nancy, Cushing. I have made a pretrial determination that she will not give testimony under oath today and that any interchange between counsel is not to be considered evidence by you of anything that is relevant in this case.
In essence, the State is introducing her and her body, as it were, for you to observe but she will be asked a few questions so that you can make some evaluations. The theory of the State’s ease being is that she is infírmed as alleged, that she is aged, and that she has a progressive disease. But it will be unsworn testimony and nothing she says is to be considered to be evidence, competent evidence by you.
What followed was the direct examination and cross-examination of Gloria:
Q. Ms. Nancy?
A. Uh-huh.
Q. Hi. Could you tell everybody what your full name is?
A. Gloria T. Gunter.
Q. Gunter, okay. And are you also Ms. Cushing?
A. Oh, yeah. Cushing. I couldn’t think of Cushing.
Q. That’s okay. What does everybody call you? When you introduce yourself, what do you say your name is?
A. Nancy.
Q. Nancy. And so—
A. Because that’s my nickname.
Q. That’s your nickname.
A. Forever and ever.
Q. And how old are you, Ms. Nancy?
A. I’m 75.
Q. Did you ever live in Watson, Louisiana?
A. I live there now.
Q. You live there now. Do you—
A. Well, right now I’m staying in Den-ham Springs at the nursing home.
Q. Okay, okay. And do you have any children?
A. I don’t have any.
Q. All right.
A. I had one but it died.
Q. It died. I’m sorry about that.
A. That’s all right.
11SQ. Do you know a person name [sic] Gary Gorman?
A. I sure do.
Q. And how is it that you know him? How do you know him?
A. He just came by the house one day and introduced hisself [sic] and I knew somebody that he knew and so we got to talking.
Q. Okay.
A. But that’s all I know about him,
Q. Okay. Do you know how many times you’ve actually talked to him? Is it just that one time, or more times?
A. Not many more times.
Q. Not many more times?
A. No. I haven’t seen Gary in God knows how long.
Q. Do you have any problems with your eyesight?
A. I can’t see at all hardly.
Q. You can just kind of see images?
A. Yes. That’s all. ■
Q. Do you work, Ms. Cushing?
A. I work for the Jefferson Parish Sheriffs Office.
Q. You work for them right now?
*366 A. Yes, off and on.
Q. Off and on. What kind of work do you do for them?
A. I hunt.
Q. You hunt? What kind of hunting do you do?
A. Criminals.
Q. Oh, you hunt criminals.
A. Yeah.
Q. Okay. Okay. And how many days a week would you say that you work? When you said you work off and on, how often do you work?
A. I guess I haven’t worked in a long— for a good while. About four months. Q. About four months, okay. And, Ms. Cushing, how long have you lived in Watson?
A. Oh, God, for a long time.
Q. Have you ever lived in Oak Grove, Louisiana?
A. I — that’s my hometown.
Q. That’s your hometown.
A. It sure is.
Q. You have brothers and sisters?
A. I sure do.
Q. And what’s some of your siblings’ names, your brothers and your sisters? A. One was Doug Gunter, the other one was Jeter Gunter, then the next one was Donald Gunter, and the next one was — the next one was me.
Q. The next one was you.
A. And the next one was Johnny Gun-ter. And then my daddy died and so my mother married Donzie Robertson, and I have my little half-brothers and-sisters. And I love them dearly.
Q. Do you. Do you have a sister named JoAnn?
A. Yes.
Q. Has she been with you the last few days?
A. She’s with me all the time.
Q. Okay.
A. She really is.
Q. She takes care of you?
A. Yeah she does.
|14Q. Ms. JoAnn [sic], when you leave here today, where are you going? Do you know?
A. I guess — I want to go back to Watson — I mean Denham Springs.
Q. You’ll go back to Denham Springs. A. Uh-huh.
Q. Okay.
Ms. Herbert: Thank you, Ms. Nancy. I appreciate you answering my questions. Ms. Cushing: Well, you’re sure welcome. I hope I answered them—
By Ms. Herbert: Q. Oh, I do have one other question. Ms. Nancy, do you remember ever talking to me before today?
A. It seems to me like I do but I can’t see you real well.
Q. Okay. Can you see if someone’s up close to you, real close?
A. I know him. (Indicating to Judge Bennett)
Q. You know him? How do you know him?
A. Well, seen his picture in the paper, I guess.
Q. Okay. All right.
Ms. Herbert: May I approach the witness, your honor?
The Court: Yes, ma’am.
By Ms. Herbert: Q. Ms. Nancy, can you see me now?
A. Yeah.
Q. Okay. Do you remember ever talking to me before?
A. Yeah.
Q. When did we talk?
*367 A. Well, I think we talked this weekend.
Q. This weekend.
A. Didn’t we?
Q. Okay. But that would have been like Saturday or Sunday?
A. Yeah.
Q. Do you remember talking to me yesterday?
A. Oh, yeah.
Q. Okay.
A. That was — yeah.
Q. That’s when it was?
A. Yeah, it was.
Q. That’s okay.
Ms. Herbert: Thank you, Ms. Nancy. I appreciate it.
Ms. Cushing: Oh, you’re welcome, and thank you, hon.
Ms. Herbert: Thank you.
Ms. Herbert: That’s all, your honor.
Ms. Cushing: I’m sorry
Ms. Herbert: It’s okay.
Ms. Cushing: — that I can’t talking [sic] to you like I used to. I guess it’s my nerves.
Ms. Herbert: It’s okay. You’ve done great. Thank you, Ms. Nancy. I appreciate it, okay.
Ms. Cushing: Okay. Thank you, hon.
The Court: Ms. Nancy, this gentleman’s going to ask you a few questions, okay? Ms. Cushing: Okay.
By Mr. Betts: Q. Good morning, Ms. Nancy. How are you today?
A. Oh, good. Thank you so much.
Q. You said you remember Gary Gor-man?
hsA. Yes, sir.
Q. Do you remember meeting him about 20 years ago in the old Watson supermarket?
A. I sure do.
Q. Do you remember over the last ten or 15 years that you loaned him some money to help out with his landscaping business and he always paid you back?
A. No, he didn’t.
Q. Didn’t pay you back?
A. I didn’t even loan him anything.
Q. Didn’t loan him any money.
A. No, because I didn’t have it to loan him.
Q. But do you remember telling the Sheriffs Office and the elderly services folks that you often loaned him money and he always paid it back?
A. No. I didn’t tell them that at all.
Q. Didn’t tell them that at all.
A. I sure didn’t.
Q. Do you remember does he have any children?
A. Yeah, he sure does. He’s got four little children. He’s got a boy.
Q. Okay.
A. And I understand he’s going to have another one, I don’t know. I really didn’t know. I haven’t seen him in a long time.
Q. So as best you remember today, he’s got one boy and about to have another one?
A. Yeah.
Q. And do you remember being in a car accident back in 2009?
A. I don’t remember it but I think I was in a car accident and he caused it.
Q. He caused the accident?
A. Uh-huh.
Q. Oh, how did he cause the accident?
A. Well, somebody told — they told me that he was driving the car when it was wrecked — he wrecked it. And I was nearly killed in it.
*368 Q. Was that JoAnn, your sister, that told you that?
A. Uh-huh.
Q. No.
A. It was people around Watson.
Q. People around Watson told you that.
A. Uh-huh.
Q. Okay. Do you remember what hospital you had to go to?
A. Probably the Lady of the Lake, I don’t know. I remember being in- the Lady of the Lake several times.
Q. Do you travel much?
A. Not anymore.
Q. Do you remember—
A. I used to'.
Q. Do you remember flying up to New York in 2008?
A; No, I didn’t.
Q. Okay.
A. . I don’t remember.
Q. Do you remember having an annuity, an insurance annuity?
A. I didn’t know.
Q. Okay. Do you remember while you were in the hospital after the car wreck Gary Gorman visiting you?
11(iA. I don’t remember him visiting me in the hospital.
Q. Do you remember him calling you? A. I don’t remember that either.
Q. After the car wreck in 2009, did you ever drive again after that?
A. I doubt it. No, I don’t think I did.
Q. After that, did you live by yourself in Watson?
A. I do. I still do. I like to live by myself.
Q. Okay.
A. Because I like a clean house and I keep it clean.
Q. Do you have any pets? -
A. Yes, I have four dogs — I had three dogs and I love them dearly. And then when they died I liked [sic] to died too. And I just loved those little dogs.
Q. Did you ever have a cat?
A. I don’t think I hád a cat but I probably wanted one.
Q. The dogs that you had, did you keep them in your bedroom?
A. Yeah. They slept with me.
Q. And do you remember keeping a stack of newspapers to spread out on the floor so they could potty?
A. I sure do. I sure remember all that.
Q. Do you remember Mr. Gorman coming to the house and helping you write out your bills?
A. No. He never did help me write out a bill.
Q. Never did?
A. Never did.
Q. Okay. Did anybody ever help you write out your bills?
A. No. I always did that myself.
Q. But none of your neighbors ever •helped you write out your bills?
A. No, Uh-uh.
Q. Okay.
A. I always did that myself.
The Court: Counsel, as I said, this is not evidence. Just wrap it up if you can.
By Mr. Betts: Q. Do you know if you’ve ever met me before?
A. I don’t remember.
Q. Okay. Can you see me from where you’re sitting?
A. Not real good.
Q. Or do I need to come over? Can I come around there?
A. Okay. Yeah.
*369 Mr. Betts: Your Honor, may I approach?
The Court: You may indeed.
By Mr. Betts: Q. Hi. Do you remember meeting me before?
A. I really don’t.
Q. You don’t remember?
A. I don’t remember.
Q. Okay.
Mr. Betts: Thank you very much. Thank you so much, Ms. Cushing.
Ms. Cushing: Okay.
The Court: Counsel, approach.
(Whereupon, a bench conference without the presence of the court reporter.)
By Mr. Betts: Q. Ms. Nancy, do you think you would recognize Gary Gorman if you saw him today?
A. I doubt it.
Q. You doubt it?
|17A. I haven’t seen him in a long time. Q. Okay. How long do you think it’s been since you saw him? How many years?
A. I imagine about two years.
Q. Okay.
Mr. Betts: (To Mr. Gorman) Why don’t you go up? I’m going to send this young fellow over there to where you’re sitting.
Ms. Cushing: Okay.
Mr. Betts: See if you recognize him.
Mr. Gorman: Ms. Nancy, do you recognize me?
Ms. Cushing: Yeah. You’re Gary.
Mr. Gorman: That’s right.
Ms. Cushing: I sure do. But you’ve aged.
Mr. Gorman: Yes, I know.
Ms. Cushing: You sure have. You sure have. Yes, I recognize you.
Mr. Gorman: Yes, ma’am.
The Court: Have a seat, Mr. Gorman.
Mr. Betts: Thank you so much, Ms. Nancy.
Ms. Cushing: Oh, you’re welcome.
Preliminary questions concerning the competency or qualification of a person to be a witness or the admissibility of evidence shall be determined by the court. La.Code Evid. art. 104(A). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La.Code Evid. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. La.Code Evid. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. La.Code Evid. art. 403.
Every person of proper understanding is competent to be a witness except as otherwise provided by legislation. La.Code Evid. art. 601. Proper understanding is the test of competency for any witness. See State v. Bennett, 591 So.2d 1193, 1195 (La.App. 1st Cir.1991), writ denied, 594 So.2d 1315 (La.1992). Ultimately, questions of relevancy and admissibility of evidence are discretionary calls for the trial court. Such determinations regarding relevancy and admissibility should not be | ^overturned absent a clear abuse of discretion. See State v. Mosby, 595 So.2d 1135, 1139 (La.1992).
In this case, in ruling that Gloria would not give testimony under oath and referring to what she would be saying on the stand as “unsworn testimony,” it appears the trial court found Gloria incompe *370 tent to testify. But regardless of whether or not the testimony was unsworn, Gloria took the stand and testified. In its charge, the trial court informed the jurors that, on the one hand, they were to observe Gloria on the stand and to make evaluations but, on the other hand, to consider nothing Gloria said as evidence. It is not clear how one can not consider that which one is tasked to evaluate. Gloria’s merely taking the stand had evidentiary value and, of course, her actual testimony had evidentia-ry value; that is, it was relevant and probative. See Pennsylvania v. Muniz, 496 U.S. 582, 595 n. 9, 110 S.Ct. 2638, 2647 n. 9, 110 L.Ed.2d 528 (1990) (testimony includes both verbal and non-verbal communication). Thus, the jurors were asked to evaluate what clearly had evidentiary value, to arrive at a determination regarding Gloria’s mental state based on their observations and what they heard, and then to disregard what they had come to learn about Gloria when it came time to deliberate.
Here, the jurors were tasked with the impossible. If Gloria was an incompetent witness, she should not have taken the stand and testified. Thus, the trial court incorrectly relied on the balancing test of La.Code Evid. art. 403 when it ruled Gloria could testify, but the jury could not consider her testimony as evidence. By definition, Article 403 applies to relevant evidence.
Accordingly, we find the trial court abused its discretion in ruling that Gloria could testify, but the jury could not consider such “unsworn” testimony as evidence. Despite the apparent relevance of Gloria’s testimony to show her mental condition, such testimony should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, |1fland misleading the jury. See La.Code Evid. art. 403. We note particularly the contusion the trial court’s instructions would have created in the minds of the jurors.
Despite the trial court’s erroneous ruling, we nonetheless find such error to be harmless. Louisiana Code of Criminal Procedure article 921 states that “[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.” The test for determining whether an error is harmless is whether the verdict actually rendered in this ease “was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
As set out in the fourth assignment of error where we addressed the sufficiency of the evidence, all of the evidence adduced and introduced at trial — testimonial, medical, and documentary — clearly established the defendant’s guilt. Whether Gloria had only early signs of dementia or fully-progressed dementia during the relevant time period, the facts established the defendant consistently diverted Gloria’s money and property away from her and used them for his own personal gain. With over a thirty-year age difference between Gloria and the defendant, the defendant used Gloria’s elderly and fragile physical and mental state to curry favor with her. The defendant let Gloria think he was her boyfriend and that maybe they would be married someday.
Under La. R.S. 14:93.4, the only element the State had to prove regarding the status of the victim was one of the following: that she was infirmed, or a disabled adult, or an aged person. The State clearly proved Gloria was aged and infirmed. While according to Dr. Walker, Gloria had symptoms of dementia as early as December of 2009, dementia, or any other diminished mental capacity, is not an element *371 under La. R.S. 14:98.4 and did not have to be proved by the State. An arguably sufficient factor to assist the State in establishing the crime of exploitation |Mof the infirmed, Gloria’s dementia, or lack thereof, was certainly not a necessary' condition to establishing the elements of the crime. Both of the elements of aged and infirmed were listed in the bill of information, and both of these elements were discussed by the trial court in its jury charges following closing arguments.
Gloria’s testimony notwithstanding, the facts clearly established that Gloria was aged (anyone over 60), see La. R.S. 14:93.3(C), was legally blind, and that her mobility greatly diminished following the car accident. It is these very qualities, without reference to any additional factor of a diminished mental capacity, that La. R.S. 14:93.4 recognizes as inherently vulnerable and susceptible to being preyed upon, and why it designates that particular status as a protected class of victims. Such a victim is by virtue of being aged or infirmed more susceptible to persuasion or being convinced of doing something he or she would not normally do.
Moreover, Gloria’s few minutes of testimony, wherein she seemed at times confused and testified to nothing regarding the defendant’s acts and deeds, was eclipsed and rendered insubstantial by the entirety of the voluminous evidence presented at trial. An error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, 763, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). Considering the foregoing, we are convinced that the guilty verdict rendered was surely unattributable to the error of allowing Gloria to testify. Any error in allowing such unsworn testimony to be presented to the jury was harmless beyond a reasonable doubt. La. Code Crim. P. art. 921; Sullivan, 508 U.S. at 279, 113 S.Ct. at 2081.
These assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, the defendant argues that, although defense counsel objected to Gloria being allowed to testify, he was ineffective for failing to |21move for a mistrial or taking emergency supervisory writs.
This claim of ineffective assistance of counsel is baseless. Defense counsel properly objected to the admission of the evidence and preserved the issue for appeal (which has been addressed in full). Once a trial judge overrules a defendant’s objection, there is no requirement to then request a mistrial, because to do so would have been useless. See State v. Boutte, 93-1249 (La.App. 3rd Cir.4/6/94), 635 So.2d 617, 619. Once the objection has been made and overruled, clearly the court would additionally refuse any request for admonition or mistrial. See State v. Williams, 373 So.2d 1278, 1280 (La.1979).
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 7

In his seventh assignment of error, the defendant argues that although he was indigent, the trial court refused to determine his status as such, and this prevented the defendant from having the opportunity to file any “motion for new trial, arrest of judgment, etc.”
This issue is neither briefed nor argued. An assignment of error not briefed is considered abandoned. See Uniform Rules-Courts of Appeal, Rule 2-12.4; State v. Dewey, 408 So.2d 1255, 1256 n. 1 (La.1982). Moreover, the motions complained of by *372 the defendant are required to be disposed of before sentencing. See La.Code Crim. P. arts. 821(A), 853, & 861. The defendant was represented by counsel throughout his trial and his sentencing. Thus, the filing of such motions was within the purview of defense counsel and had nothing to do with the defendant’s alleged pauper status.
This assignment of error is without merit.
For the reasons assigned, the defendant’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
WHIPPLE, C.J., concurs in the result.
McCLENDON, J., concurs in the result watched by the majority.

. Acts 2014, No. 811, § 6, effective June 23, 2014, changed some terminology to refer to persons "with infirmities” or "who is aged” or "with intellectual disabilities.”