DENNIS R. BAGNERIS, SR.,'Judge.
| TDefendant, Philip Gibson, appeals his conviction on charges of exploitation of persons with infirmities, a violation of La. R.S. 14:93.4. For the reasons that follow, we affirm.
STATEMENT OF CASE
On June 16, 2011, the defendant, Philip Gibson, was indicted on one count of exploitation of the infirmed, in violation of La. R.S. 14:93.4. The indictment alleged that between July 2009 and May 2011, defendant .used a power of attorney to access accounts of the victim, Thelma Sea-bolt, an aged and infirmed person, for his own profit or advantage by means of fraudulent conduct, practices or representations. The defendant entered a plea of not guilty. On October 12, 2011, he elected-a bench trial.
On November 16, 2012, the trial court allotted the case to another section upon consideration of a motion to recuse the Orleans Parish Criminal District RCourt En Banc filed on behalf of the State through the Louisiana Attorney General’s Office.[1]
On February 15, 2012, the trial' court granted defense counsel’s Motion to Withdraw. The court then appointed the Orleans Public Defender’s Office to represent defendant. On January 16, 2013, the defendant’s appointed counsel filed a motion *775 for a jury trial. The motion was denied on March 25, 2013. •
On January 6, 2014, the defendant filed a pro se motion to quash due to improper venue. His counsel filed a motion to vacate all actions taken by the trial judge to whom the case had been allotted in October 2011. The matter was then re-alloted to another section of court. Thereafter, the defendant’s motion to quash, motion to declare the allotment system unconstitutional, and motion to reduce bond were denied on June 9,2014.
Defendant’s three-day bench trial began on September 22, 2014. At the conclusion of the trial, defendant was found guilty as charged. Subsequently, the State filed a multiple bill of information.
On November 3, 2014, the trial court denied defendant’s motion for post-verdict judgment of acquittal and sentenced defendant to eight years at hard labor, with credit for time served. The trial court then adjudged the defendant a quadruple offender. It vacated the original sentence and re-sentenced the defendant to twenty years at hard labor. The present motion for appeal followed.

STATEMENT OF FACT

The following testimony was adduced at trial.
| sKeith Herr, an American Express representative, identified exhibits introduced by the State as copies of records belonging to the account of Thelma M. Seabolt.[2]
Anthony Dillman a senior investigator for financial crimes involving CitiBank, identified CitiBank Mastercard records of accounts that belonged to Thelma M. Sea-bolt and her husband, John E. Seabolt.
Amy Lyons, an operations officer with Fifth District Savings' Bank, identified withdrawal records from the Seabolts’ accounts. The records included an October 26, 2009 withdrawal of $7,084.28 from an IRA account that belonged to Mrs. Seabolt and a November 25, 2009 withdrawal of $2,084.00, the balance of that account. Ms. Lyons maintained that the withdrawals were accomplished through the power of attorney the defendant had from Mrs. Sea-bolt. Ms. Lyons also identified documentation from July 27, 2010. Those documents depicted the closing of another IRA account that belonged to Mrs. Seabolt in the amount of $16,257.85. Again, the defendant completed the transaction via his power of attorney. Ms. Lyons also authenticated withdrawals .and closing of certificate of deposits the defendant completed in the name of Mrs. Seabolt, allegedly through the power of attorney. The transactions included the following dates and amounts:
January 7,2010 $34,085.99
February 22,2010 $ 8,329.35
March 11,2010 , $ 2,207.76
March 17,- 2010 $12,999.99
April 19,2010 $17,771.43
May 18, 2010 $15,000.00
June 15,2010 $19,320.36
[ 4Ms. Lyons noted that documentation of the May 18, 2010 and June 15, 2010 transactions in the amounts of $15,000.00 and $19,320.36, respectively, indicated: ' “For further credit if applicable. Endorsed to Love Outreach Fellowship.” Ms. Lyons said these transactions had not been brought to her attention as they occurred.
The State’s next witness, Tom Murray, a Chase Bank Branch Manager, identified certain Chase business records. Tliese records included a signature card with Thelma Seabolt, Terry Lynn Boudreaux, Mrs. Seabolt’s niece, and the defendant as authorized signatories. He also identified copies of every check written against that *776 account. Mr. Murray acknowledged that the bank held the funds in a joint account, meaning that Mrs. Seabolt, Ms.-- Bou-dreaux, and the defendant had equal access to the account.
Mr. Mario Bogran, employed by the Whitney Bank as a senior investigator in the corporate security department; identified Whitney Bank records. He testified the records were copies of bank statements and checks cashed against that account. The account in question listed the defendant and John Edgar Seabolt as holders of the account. Mr. Bogran also identified a power of attorney Ms. Seabolt had given to the defendant. The power of attorney reflected defendant’s Texas address, social security number, and date of birth.
James Ledoux, in-house counsel for the First NBC Bank, testified that his responsibilities included regular review of bank documents. He authenticated copies of banking documents which showed Love Outreach Fellowship as the holder of a specific account. Mr. Ledoux identified State exhibits which described a depository resolution with Love Outreach Fellowship as the depositor with Mrs. Seabolt’s home address. The resolution was dated January 6, 2010 and bore the Uname “Phil .Gibson, President of Love Outreach Fellowship”, as the authorized signator. Mr. Ledoux also identified a signature card for the account held by Love Outreach Fellowship, a driver’s license in the name of Philip J. Gibson, and a Texas identification card bearing the name Philip J. Gibson. On cross-examination, Mr. Ledoux conceded that he played no part in any investigation of the defendant.
Dr. Wanda Robinson, an Ochsner Clinic family practice physician, testified that she treated Thelma Seabolt from April 2009 until about 2012. Dr. Robinson said that Mrs. Seabolt suffered from dementia/Alzheimer’s disease. Mrs. Seabolt’s illness manifested itself through loss of memory, cognitive impairment and loss of ability to perform activities of daily living without assistance. Dr. Robinson stated that someone with severe dementia, like Mrs. Seabolt, would be incapable of handling her financial affairs and unable to navigate day-to-day living without assistance. Dr. Robinson noted that Mrs. Seabolt also suffered from spinal stenosis and hypertension.
Dr. Edward Waitt, an Ochsner internal medicine physician, testified that he treated Mrs. Seabolt from 2003 to 2009.[3] During that time, Dr. Waitt witnessed her mental capacity deteriorate due to dementia/Alzeheimer’s disease. Dr. Waitt described Mrs. Seabolt’s mental acuity when he last treated her on April 21, 2009 as follows:
... if MCI [mild cognitive impairment] is a one or a two, and when a person becomes totally vegetative ... and unable to care for himself or herself, calling that a ten, I’d say she was probably around seven'_
Ms. Susan M. Peterson testified that she was a trust and estate attorney. She had known Mr. and Mrs. Seabolt for twenty years. Ms. Peterson prepared a power |fiof attorney for Mrs. Seabolt after Mr. Seabolt’s death. She identified the joint power of attorney, dated June 10, 2009, that gave Terry Lynn Boudreaux and the defendant the power to act on Mrs. Sea-bolt’s behalf.
Richard Regan, a real estate attorney, testified that he prepared the closing documents for the 2010 bond for deed transfer .of the property located.at 2414 Halsey Avenue. He identified the bond for deed *777 document from Mr. and Mrs. Lyle Jones to Blue Goose Promotions, Inc., in the amount of $168,000. The document covered the Halsey Avenue property and indicated that Blue Goose Promotions, Inc. was represented, by the defendant as the authorized director. Mr. Regan also identified copies of the cancellation of the aforementioned bond for deed that had been executed by Mr. and Mrs. Lyle Jones.
Robin Regan testified that she was the escrow agent regarding the February 4, 2010 bond for deed on the Halsey Avenue property. The monthly payment was $942.04. Ms. Regan identified a check for that sum which had been drawn on an account in the names of Mr. and Mrs. Seabolt. Other checks and ACHs were written against Love Outreach Fellowship’s bank account and marked for identification as “office rent.” Ms. Regan recognized the defendant as the person who came to her office to make monthly escrow payments. She also identified his signature. Ms. Regan also identified copies of a check returned by thé bank as unpaid, a notice of delinquent city taxes in the amount of $3,237.92 on the Halsey Avenue property, and an account statement indicating a past due amount of $3,237.92 which was dated September 6,2011.
17James Mahasseh, a criminal defense attorney, recalled that he received from the defendant a bank transfer from Discover Bank in the amount of $7,000.00 on November 17, 2010.
• Jason Hernandez, an attorney employed by Crescent Title Company, recognized the State’s exhibit relative to a standard Fannie Mae mortgage document dated November 9, 2010. The address on the document was 2414 Halsey Avenue and .reflected Chase Bank as the = lender. The $50,000.00 mortgage listed Thelma Seabolt as the borrower. The defendant and Inez Sharp were listed as witnesses. Mr. Hernandez testified that after city taxes, routine closing costs, title and recordation fees, and American Express and Discover costs paid, Mrs. Seabolt netted $24,260.34. Mr. Hernandez acknowledged on cross-examination that he was present when Mrs. Seabolt signed the promissory note securing the Chase Bank mortgage and noted the defendant signed the closing documents as a witness only.
Terry Lynn Boudreaux, Mrs. Seabolt’s niece, stated that she lived in Texas. She testified that her “Aunt Margie” was a frail, dependent person whose health began to deteriorate in late 2005. After her Uncle Seabolt died in 2009, Ms. Boudreaux visited her aunt on weekends and found her unable to take care of her affairs. In June 2009, Ms. Boudreaux executed a dual power of attorney with the defendant to handle Mrs. Seabolt’s affairs. At the time the power of attorney was executed, Ms. Boudreaux knew very little about the defendant other than that his parents and Mrs. Seabolt were next door neighbors who had enjoyed a close personal relationship through the years. Ms. Boudreaux testified she had little knowledge of her aunt’s financial situation after her Uncle Seabolt died.' She was advised of her aunt’s finances by the defendant, who had presumably been 18informed by Uncle Sea-bolt. Ms. Boudreaux never withdrew any money from her aunt’s accounts because she understood that the defendant was paying all the bills. She did not receive any of her aunt’s bank or credit card statements. Ms. Boudreaux was unaware that from October 2009 to July 2010, the defendant had withdrawn $133,000.00 from her aunt’s account at Fifth District Bank. She also did not know that a mortgage was placed on her aunt’s residence in November 2010. There was no concrete agreement as to the reimbursement the *778 defendant would receive as Mrs. Seabolt’s caretaker, but there was a discussion about receipt of $7.00 or $7.50- per hour. The defendant mentioned Love Outreach Fellowship to her. However, she said he did not reveal that he ■ had transferred $38,000.00 of Mrs. Seabolt’s- money to the Fellowship’s account. At some point, she said the defendant ceased caring for Mrs. Seabolt and her finances. Mrs. Seabolt was transferred to a nursing home in March 2012, and the State assumed her care. Mrs. Seabolt died on June 29, 2012.
Ms. Phyllis Gondrella testified that she grew up in the house next to Mrs. Sea-bolt’s. After Mr. Seabolt died, Mrs. Sea-bolt needed help in caring for herself. Ms. Gondrella was employed by Mr. Seabolt to care for his wife’s daily needs, i.e., bathing, eating, personal hygiene, taking medication, etc. Ms. Gondrella began caring for Mrs. Seabolt in May 2009 for three or four months. Ms. Gondrella left her position because the defendant and she disagreed on Mrs. Seabolt’s care. During the time she cared for Mrs. Seabolt, she was paid approximately $400.00 per week based on an 8:00 a.m. to 5:00 p.m. shift. She said that Mrs. Seabolt’s mental health began to decline prior to Mr. Seabolt’s death. Mrs. Sealbolt was on medication, slept many hours of the day, and her personal hygiene was poor.
|9Ms. Arlene Spence also testified on behalf of the State. She cared for Mrs. Seabolt for approximately one year at the defendant’s request. Ms. Spence cared for Mrs. Seabolt from 5:00 p.m. to 8:00 a.m. on Saturdays and Sundays, doing everything for her. Ms. Spence said it was obvious to her that" Mrs. Seabolt suffered ■ from Alzheimer’s disease. Ms.- Spence was paid by check drawn on a Whitney Bank account. Occasionally, the checks made payable to her would be returned marked “NSF.”
Ms. Barbara Faust was another of Mrs. Seabolt’s caretakers. She was hired for the amount of $8,00 an ‘hour to assist Mrs. Seabolt on Sundays from 8:00 a.m. to 5:00 p.m. The defendant lived across the street from Mrs.- Seabolt’s house and would check on her usually every day for about-one hour. Ms. Faust did not see any bank or credit card statements in Mrs. Seabolt’s name and knew nothing of Mrs. Seabolt’s financial affairs." Ms. Faust also related that there were no major repairs to Mrs. Seabolt’s home or- replacement of appliances while she sat with her. However, in the same period, the defendant remodeled his home which was across the street from Mrs.-Seabolt’s home.
State’s witness, Mr. Terry Gearhart, a regional investigator for Discover Bank, produced copies of the Discover : money market account and credit card banking records held in the names of “Thelma M. Seabolt or Philip Gibson.”
Randal Brinkhius, an investigator with the Louisiana Attorney General’s Office, started his investigation around October 27, 2010. At the time Mr. Brinkhius met the defendant, the defendant drove a car belonging tó John Seabolt. The car contained a large volume of banking records. Mr. Brinkhius learned that Mr. Seabolt was deceased and attempted to speak with Mrs. Seabolt. His investigation led him to subpoena Mrs. Seabolt’s financial records. Mr. Brinkhius’ |1nsuspicions were aroused when he learned that there was a flow of money from Mrs. Seabolt’s Whitney Bank account into seven or eight banks and credit card accounts in the name of Love Outreach Fellowship. Mr. Brinkhius identified State exhibits that were copies' of those checks. He also identified records of withdrawals made from Discover Money Bank in the name of “Thelma M. Seabolt or Philip Gibson;-”
*779 Mr. Brinkhius specifically identified a copy of a wire transfer from the First NBC Bank account of Mrs. Seabolt to the defendant in the amount of $15,000.00, He stated that another check in the amount of $5,000.00 was written from Mrs. Seabolt’s First NBC account to Sibernagle and Associates, the architectural firm that remodeled the defendant’s house. Mr. Brinkhius testified that $133,126.88 was transferred from Mrs. Seabolt’s CDs and IRAs to Love Outreach Foundation on the signature of the defendant. He also said that from March 2008 to October 2009, $6,560.40 was charged to Mrs. Seabolt’s Citibank credit card and that $17,176.97 was charged by the defendant on Mr. Sea-bolt’s Citibank credit card from September 2009 to February 2011. Mr. Brinkhius added that from September 2009 through January 2011, the defendant charged $29,199.72 to the Seabolt’s Discover credit card.
The defense called Mrs. Wilma Gibson, the defendant’s mother. Mrs. Gibson testified she lived next door to the Seabolts for more than-forty years and enjoyed a close personal relationship with , them. The defendant had known the Seabolts since the age of two. In 2008, Mrs. Gibson noticed that Mrs. Seabolt was slowing down and needed a good bit of help from Mr. Seabolt. At one point, Mr. Seabolt placed Mrs. Seabolt in a nursing home for physical therapy. Mrs. Gibson relayed that eventually, Mrs. Seabolt returned to her residence and the care of her In husband. She said Mr. Seabolt hired Ms. Phylis Gondrella and Mrs. Seabolt’s niece, Terry Lynn, to assist with Mrs. Seabolt’s care.
Mrs. Gibson claimed that after Mr. Sea-bolt’s death, the defendant began to care for Mrs. Seabolt on a twenty-four hour basis, seven days a week. She said the defendant was given co-power of attorney with Mrs. Seabolt’s niece for convenience because the niece lived in Texas. According to Mrs. Gibson, the defendant administered Mrs. Seabolt’s medication, took her to medical appointments, dinners and church socials, paid the sitters and household bills, arranged for physical therapy, cooked meals, and shopped for groceries. Mrs: Gibson assumed the defendant was being paid for his services.
Under cross-examination, Mrs. Gibson testified that the defendant moved out of her house when he was eighteen years' old. The only employment he held that she was aware of was with Copeland’s Restaurants in New Orleans and Texas. The defendant moved back to New Orleans after Hurricane Katrina and lived with Mrs. Gibson until 2009. During that time, the defendant was not working. She acknowledged that shortly after the defendant took over Mrs. Seabolt’s care, he purchased the house across the street from Mrs. Seabolt’s home.
In rebuttal, the State called Eddy Dela-diinidad. Mr. Deladiinidad testified that the defendant and he had been friends for about five years. Mr. Deladiinidad said that he traveled with the defendant to Houston and Key West on different occasions. On other occasions, they went dancing and to restaurants. The defendant covered hotel, food and transportation costs in their travels together. After the defendant purchased a house, Mr. De-ladiinidad moved in with the defendant.

ERRORS PATENT

| igA review for errors patent reveals none.

ASSIGNMENT OF ERRORS

: Defendant’s counseled assignments of error argue that the trial court erred by denying the defendant’s right to a trial by jury and that the evidence was insufficient to support his conviction. The defendant *780 argues in his pro se assignment of error that the trial record is incomplete for meaningful appellate review.
Under Louisiana jurisprudence, when a defendant presents issues of alleged errors at trial and overall sufficiency of the evidence for review under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the insufficiency of the evidence claim is addressed first. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55. Therefore, we - first review defendant’s claim that the evidence was insufficient to convict.

SUFFICIENCY OF THE EVIDENCE

In this assignment of error, the defendant complains he was convicted on the basis of circumstantial evidence which was insufficient to prove he was guilty of fraudulent conduct in his care of Mrs. Seabolt.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the' light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Captville, 448 So.2d 676, 678 (La.1984). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution, but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary .to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d at 1309-10; State v. Strother, 2009-2357, p. 10 (La.10/22/10), 49 So.3d 372, 378. “[A] reviewing, court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 384-386 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, but rather is an evi-dentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817, 820 (La.1987). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty. Captville, supra. On review, the .appellate court dóes not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. State v. Smith, 2006-0318, p. 5 (La.App. 4 Cir. 11/21/06), 946 So.2d 218, 221. Rather, the appellate court, when evaluating the evidence in the light most favorable to the prosecution, must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found guilt beyond a reasonable doubt under Jackson. Id.
*781 In this matter, defendant claims the evidence was insufficient to find him guilty of exploitation of the infirmed. Pri- or to its 2014 amendment,[4] La. R.S. 14:93.4 provided in pertinent part:
A. Exploitation of the infirmed is:
(1) The intentional expenditure, diminution, or use by any person, including a caregiver, of the property or assets of the infirmed, a disabled adult, or an aged person, including but not limited to a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility without the express voluntary consent of the resident or the consent of a legally authorized representative of an incompetent resident, or by means of fraudulent conduct, practices, or representations.
(2) The use of an infirmed person’s, or aged person’s, or disabled adult’s powér of attorney or guardianship for one’s own profit or advantage by means of fraudulent conduct, practices, or representations.
In support of his claim that the evidence was insufficient to convict, defendant represents there was conflicting testimony as to whether he exceeded the authority conferred upon him as Mrs. Sea-bolt’s caretaker. He also maintains that the State improperly relied upon work product produced by its investigators rather than the underlying evidence.
Upon consideration of his claim that the testimony conflicted regarding the facts, Louisiana jurisprudence provides that conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of hfithe witnesses, goes to the weight of the evidence, not its sufficiency. See State in the Interest of K.M., 2014-0306 (La.App. 4 Cir. 7/23/14), 146 So.3d 865. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder’s determination of guilt. Id. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Rapp, 2014-0633, p. 6 (La.App. 4 Cir. 2/18/15), 161 So.3d 103, 108. . In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980, p. 6 (La.4/1/05), 898 So.2d 1219, 1226. Appellate courts should not disturb a fact finder’s credibility decision unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082, p. 33 (La.App. 4 Cir.2/6/02), 809 So.2d 1093, 1111.
The trial judge gave the following reasons, for finding the defendant guilty as charged: ,
.... This is a very sad situation and it’s not sympathy that is motivating this verdict.. The evidence clearly shows, beyond a reasonable doubt, that the defendant exploited this, situation. Obviously, he was of the opinion that because he was doing good things for Mrs. Seabolt, that the. funds that were available were his and he treated her funds as if they were his. They weren’t his. He used them in a very personal way and it’s true that there’s some of these charges where the court is not convinced that every reasonable hypothesis of innocence has been excluded but there are far more, many of which have been mentioned and the court is not going to go into each and every one, but there are *782 far more that have been shown to this court beyond a reasonable doubt and excluding every reasonable hypothesis of innocence.
*, H* #
I also should mention that this money was earned over a great many years by Mr. Seábolt. I didn’t hear any evidence of Mrs. Seabolt working but these are two lives that came together to create this nest egg and in this day and age, ironically, had Mrs. Seabolt gone into a home, this money would have been used up completely probably during that time. Maybe not |1fiduring the whole time. Maybe not in that short period of time but the cost of these hóhies and facilities are extraordinary and [defense counsel] mentioned that caring for somebody in her condition is expensive and the court acknowledges that. The cost is exorbitant but by the same token, I think we have a situation where the defendant just went too far. He just believed that that was his own money and used it as such. He violated the statute and you are right [defense counsel]; This matter is civil but some civil matters become criminal when you have situations, such as this, where the defendant" has just gone too far. And I think he knew what he was doing and he did it by means of fraudulent conduct in the wáy these transactions were handled and ‘the court has no alternative, according to the law and the evidence, but to do what it’s done and find the defendant guilty as charged.
Similarly, defendant’s claim that the State improperly relied on its investigator’s work product goes to the weight of the evidence, not the sufficiency of the evidence. Moreover, the State’s reliance on the evidence it submits is not a relevant inquiry as to whether the evidence was sufficient to convict. Under the - Jackson due process standard for sufficiency of evidence, the pertinent appellate inquiry regarding the sufficiency of the evidence in a judge trial must remain, as it does in jury trials, on the rationality of the result and not on the thought processes of .the particular fact finder. State v. Marshall, 2004-3139, p, 6 (La.11/29/06), 943 So.2d 362, 368.
Our review of the record shows that the defendant was the primary caretaker of the eighty-two year old victim, who suffered from dementia for almost two years. At the time the defendant began caring for the victim, her net worth was $292,853.22. The State presented evidence that proved that during the period the defendant cared for the victim, he spent more , than a quarter of a million dollars of her money. He accessed her assets through a power of attorney, sophisticated real estate transactions, and a shell corporation, ultimately leaving her almost destitute, apart from her home, which he had encumbered with a home equity loan.
|T7In State v. Gorman, 2014-1108 (La. App. 1 Cir. 3/6/15), 166 So.3d 356, the appellate court concluded the evidence was sufficient for conviction for exploitation of the infirm, where the defendant took over $200,000.00 and real property from victim, who was aged, infirm, legally blind, and, according to her physician, suffering- from symptoms of dementia.
In the present matter, when we apply the legal' precepts discussed herein to the evidence introduced at trial, we must also conclude that any trier of fact could have rationally' concluded that the defendant’s appropriation of Mrs. Seabolt’s possessions was an intentional diminution of her property or assets. Therefore, upon review of the record in its totality, defendant’s claim that the evidence was insufficient to convict lacks merit.
*783 We now review defendant’s claim that he was denied his right to trial by jury.

TRIAL BY JURY

Defendant complains he was denied his constitutional right to a jury because the trial judge' refused to allow him to withdraw his previous request to waive his right to a jury trial.
Both the United States Constitution and the Louisiana Constitution guarantee an accused the right to a jury trial. U.S. Const. Amend. VI; La. Const, art. I, § 17. If the punishment that may be imposed on a defendant exceeds six months confinement, the Louisiana Constitution provides that the defendant shall be tried by a jury; however, in non-capital cases “a defendant may knowingly and intelligently waive his right to a trial by jury.” La. Const, art. I, § 17(A); State v. Biddy, 2013-0356, p. 20 (La.App. 4 Cir. 11/20/13), 129 So.3d 768, 780.
 . |1sThe waiver of the right to a jury trial cannot be presumed. State v. McCarroll, 337 So.2d 475, 480 (La.1976); State v. Santee, 2002-0693, p. 3 (La.App. 4 Cir. 12/4/02), 834 So.2d 533, 534. A waiver of the right to trial by jury is valid only if the defendant acted knowingly and voluntarily. State v. Kahey, 436 So.2d 475, 486 (La.1983); Santee, 2002-0693 at.p. 3, 834 So.2d at 534. Although the trial judge must determine if the defendant’s jury trial waiver is knowing and intelligent,, the determination does not require a Boykin-like colloquy. Santee, 2002-0693 at p. 3, 834 So.2d at 535.
In State v. Edwards, 2013-0665, p. 4 (La.App. 4 Cir. 1/22/14), 133 So.3d 132, writ den. 2013-0383 (La.9/26/14), 149 So.3d 259, this Court recognized:
Whether a criminal defendant waives her right to trial by jury in an intelligent, competent, self-protecting manner necessarily depends upon the circumstances unique to each case. See Adams v. United States ex rel. McCann, 317 U.S. 269, 277-278, 63 S.Ct. 236, 87 L.Ed. 268 (1942). A defendant need only know and understand that the choice confronting her .is, “on the one hand, to be judged by a group of people from the community, and on the other hand, to have. her guilt or innocence determined, by a judge.” State v. Bazile, 12-2243, p. 17 (La.5/7/13), 144 So.3d 719. If a defendant understands that choice, her jury waiver is deemed knowing and intelligent. See id., 12-2243 at p. 17, 144 So.3d at 733. No greater proof, of knowing and intelligent waiver is constitutionally or jurisprudentially required. See State v, Johnson, 389 So.2d 1302, 1304-1305 (La.1980). Additionally, - in reviewing a defendant’s claim that her waiver of trial by jury-was not knowing or intelligent, we do not- consider the strategic considerations, motivations, or benefits underlying a defendant’s waiver, but instead restrict ourselves solely to the issue of her knowledge. See Bazile, 12-2243 at p. 18, 144 So.3d at 733. The preferred procedure for’ a trial judge to ascertain whether a defendant wishes to waive her right to trial by jury is for the trial judge to advise the- defendant personally on the record about the intended waiver and to'require the defendant to waive the right in writing or verbally in open court on the record. See State v. Bryant, 06-1154, p. 7 (La. App. 4 Cir. 1/10/07), 950 So.2d 37, 40; State v. Richardson, 575 So.2d 421, 424 (La.App. 4 Cir.1991); State v. Wolfe, 98-0345, p. 6 (La.App. 4 Cir. 4/21/99), 738 So.2d 1093, 1097; State v. Abbott, 92-2731 (La.App. 4 Cir. 2/25/94), 634 So.2d 911, 913. When, as in this case, the trial judge does not follow' Lathis preferred procedure, we may nevertheless conduct a de novo review of the record to ascer *784 tain whether the defendant was advised of her right to trial by jury, whether-the defendant was present when her counsel elected trial by judge, and, if she was present, whether she voiced any objection to the election. See State v. Santee, 02-0693, p. 3 (La.App. 4 Cir. 12/04/02), 834 So.2d 533, 535; State v. Denson, 11-0517, pp. 7-8 (La.App. 4 Cir. 1/25/12), 83 So.3d 1183, 1188-1189.
Id., 2013-0380, p. 4,133 So.3d at 135.
The defendant herein was charged with a felony (La. R.S. 14:93.4), thereby entitling him to a jury trial. See U.S. Const. amends. VI and XIV; Duncan v. State of Louisiana, 391 U.S. 145, 149-150, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
At defendant’s arraignment on June 21, 2011; the record is silent as to whether he made a selection as to a bench or jury trial. It is also silent as to whether the trial judge advised him of his right to select a jury or bench trial. However, on October 12, 2011, the defense filed its motion for an Election of Bench Trial. The motion was signed by defense counsel and the defendant. The minute entry of the same- date showed the defendant was present with counsel, in court when the election for bench trial motion was filed and that he voiced no objection, to the fact that the trier of fact would be a judge rather than a jury. Moreover, on November 15, 2011, the defendant filed a “Provisional Waiver of Alleged Potential Bias by Judge Derbig-ny.” This also was signed by defense counsel and the defendant. The waiver stated “[the defendant] believes that Judge Derbigny is and will remain, fair, unbiased and impartial.” -
In his subsequent Motion for Jury Trial dated January 16, 2013, the defendant presented two arguments to the trial court. First, he .argued that because there was no Boykin-like colloquy in the record, his waiver could not be deemed knowing and intelligent. Second, in reliance upon State v. Catanese, 385 So.2d 235 (La.1980),[5] he maintained that he should be permitted to withdraw his waiver of jury trial because the waiver would not interfere with the orderly administration of the business of the court or result in undue delay or inconvenience; and referenced that when considering a motion to reinstate a jury trial, “the trial judge should balance the legitimate interests of the prosecutor and the court against the defendant’s fundamental interest in the safeguard of a trial by jury.” Id., 385 So.2d at 237.
On appeal, the defendant has abandoned his argument as to the absence of a Boy-fcm-like colloquy, that is, whether he made a knowing and intelligent waiver of his right to a jury trial. Instead, the defendant argues only on appeal that the trial court’s failure to permit him to reinstate his right to trial by jury denied him his fundamental right to a jury trial. In support' of' this argument, he ' re-urges the outcome reached in State v, Catanese, in particular, that the right to trial by jury is such a fundamental right that a defendant should be permitted to withdraw his waiver of a jury trial where the withdrawal does not interfere with court business or causes delay. We- find that ar’gument, however, to be misplaced.
As acknowledged by the defendant, the reasoning expressed in Catanese was abrogated in pertinent part in 2010 when La. *785 Const, art. I, § 17(A)[6] was amended to provide that a criminal defendant’s waiver of his right to trial by jury is irrevocable. The Louisiana Supreme Court explained that La. Const, art. I, § lTfaCA) was enacted by the legislature, after approval by voters, in “an effort to prevent what were perceived as abusive practices by defendants in criminal cases exercising waivers of jury trials in order to disrupt trial schedules... ,”[7]
The defendant suggests that if indeed the irrevocable waiver provisions of La. Const, art. I, § 17(A) do deny him the right to a jury trial, the article would be unconstitutional as it would arguably conflict with the federal constitutional right to a jury trial protected under the Sixth Amendment of the United States Constitution. However, the defendant did not challenge the constitutionality of the waiver provisions of La. Const, art. I, § 17(A) in the trial court. A constitutional challenge “must be specially pleaded and the grounds for the claim particularized” at the trial level in ordered to be considered upon appellate reviéw. See State v. Hatton, 07-2377, p. 14. (La.7/1/08), 985 So.2d 709, 719. As the defendant did not do so, he is therefore barred from raising this issue before this Court.
As referenced herein, on appeal, the defendant does not contest that he made a knowing and intelligent waiver of his right to trial by jury.[8] Therefore, as the facts demonstrate that he waived his right to a jury trial, we are compelled to find that this waiver was irrevocable pursuant to La. Const, art. I, § 17(A). Hence, the trial court did not err in denying defendant’s motion to reinstate his right to a jury trial.
This assignment of error is without merit.

IsaINCOMPLETE TRIAL RECORD

Defendant argues in his pro se supplemental brief that he cannot obtain meaningful appellate review because certain documents and transcripts' are not in the appellate record. In particular, he alleges that transcripts from his motion to quash for deficient bill of particulars, motion to quash for time limitation, motion to quash venue, motion to vacate previous judge rulings, and motion for illegal transfer áre not included in the appellate record. He also contends that the transcript from the October 31, 2013 hearing regarding the trial court’s granting in part and denying in part the defense motion for exculpatory evidence, and the transcript from the December 19, 2012 hearing regarding the defense’s motion for sanctions for failure to comply with defense motion for exculpatory evidence also are not a part of the appellate record.
In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, the Supreme *786 Court reviewed a complaint by a defendant regarding alleged deficiencies in his appellate record- The Court stated:
Both in this court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceed-ings_ Further, in Louisiana, a defendant is constitutionally guaranteed the right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” , La. Const, art. I, ,§ 19. Thus, material omissions from the transcript of the proceedings at trial bearing.on the merits of an appeal will require reversal.... On the other hand, inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may none-the-less be adequate for appellate review.... Finally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts.
|Já, 98-0541, pp. 10-11, 802 So.2d at 1234 (citations omitted). Therefore, pursuant to Deruise, a meaningful appellaté review of a defendant’s conviction and sentence may be accomplished although portions of the trial record may be missing. See also State v. Massey, 2009-1728 (La.App. 4 Cir. 11/5/10), 51 So.3d 808.
In the matter before us, the defendant fails to demonstrate, or particulárizé how he was prejudiced by the absence of the transcripts or documents he claims are missing from the record. As previously referenced, in viewing all the evidence contained in the appellate record herein, this Court finds sufficient evidence existed for any rational trier of fact to have convicted the defendant of the offense charged herein. Accordingly, we assign no merit to this assignment of error.

CONCLUSION

Wherefore, based on the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED
TOBIAS, J., concurs and assigns reasons.

. The State’s Motion to Recuse, and the request that the Supreme Court appoint an ad hoc judge were considered in Conference by the Louisiana Supreme Court, The Court de-dined to exerdse its constitutional appoint-menVassignment power in this particular case.

. Mrs. Seabolt is referred to interchangeably as "Thelma Seabolt” and "Marjorie Seabolt” throughout the record. Her name is actually "Thelma Marjorie Seabolt.”

. Dr. Waitt noted that Mrs. Seab.olt was eighty-two years old in 2009.

. Acts 2014, No. 811, § 6, effective June 23, 2014, changed some terminology to refer to persons “with infirmities” or “who is aged" or "with intellectual disabilities.”

. In Catanese, the Supreme Court found that the trial court abused its discretion in denying defendant’s motion to reinstate his right to a jury trial where the defendant moved to reinstate his right to jury trial before the case was set for trial, trial was not commenced for approximately one and one-half months after his motion was denied, and no prejudice would have resulted to the State from the reinstatement of the jury trial.

. La. Const, .art. I, § 17(A) provides . in part that "[ejxcept in capital cases, a defendant may knowingly and intelligent waive his right to a trial by jury but no later than' forty-five days prior to the trial date and the waiver shall be irrevocable.” Art. I, . § 17 was amended by Acts 2010, No. 1053, Sec. 1, approved November 2, 2010, and became effective December 1, 2010.

. State v. Bazile, 2011-2201, p. 1 (La. 1/24/12), 85 So.3d 1.

. Notwithstanding, this Court notes that the record reflects that: the defendant was represented by counsel; he and his attorney signed the Election of Bench Trial motion; and he was present when the election was presented to the trial court and voiced no objection. Based on similar facts, Louisiana jurisprudence has found that such jury trial waivers were knowingly and intelligently made. See State v. Phillips, 365 So.2d 1304, 1309 (La. 1978); State v. Peters, 2010-0326, p. 9 (La. App. 4 Cir. 2/16/11), 60 So.3d 672, 678; State v. Santee, 2002-0693, p. 4 (La.App. 4 Cir. 12/04/02), 834 So.2d 533, 535.