STATE OF LOUISIANA       *       NO. 2024-KA-0664

VERSUS       *

      **COURT OF APPEAL**

JOHN DUNCAN       *

      **FOURTH CIRCUIT**

      *

      **STATE OF LOUISIANA**

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-390, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)

**LOBRANO, J., CONCURS IN PART, AND DISSENTS, IN PART, AND ASSIGNS REASONS**

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, LA 70073-2333

      COUNSEL FOR DEFENDANT/APPELLANT

Jason Rogers Williams, District Attorney
Brad Scott
Joseph Tucker
Matthew Derbes
Patricia Amos
619 South White Street
New Orleans, Louisiana 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

      **VACATED IN PART; AFFIRMED IN PART**
      **December 22, 2025**

This is a criminal case. Defendant—John Duncan—appeals raising two issues. First, he challenges the sufficiency of the evidence as to each of the three offenses for which he was convicted—second-degree murder, obstruction of justice in a murder investigation, and possession of a firearm by a convicted felon. Second, he challenges the admission of La. C.E. art. 404(B) evidence—his prior second-degree murder conviction. For the reasons that follow, we vacate the obstruction of justice conviction and sentence; and we affirm the second-degree murder and possession of a firearm by a convicted felon convictions and sentences.

**Statement of the case**

On December 17, 2012, the 36 year old victim—Michael Rogers ("Mr. Rogers")—was shot and killed while sitting in his wheelchair under the canopy of a city bus stop in New Orleans, Louisiana. Five months later, an Orleans Parish grand jury returned an indictment charging Mr. Duncan with one count of each the following three offenses: (i) second-degree murder, a violation of La. R.S. 14:30.1; (ii) obstruction of justice, a violation of La. R.S. 14:130.1; and (iii) possession of a

1

firearm by a convicted felon, a violation of R.S. 14:95.1. Mr. Duncan pled not guilty. Before trial, the State filed a motion to introduce other crimes evidence under La. C.Cr.P. art. 404(B)(1), and La. C.Cr.P. art. 720, which the district court granted.

In April 2024, a four-day jury trial was held in this matter. On the first day of trial, the parties submitted a joint stipulation of facts, agreeing to the following:

- On May 1, 2004, John Duncan, along with 3 accomplices attempted to arm rob Daniel Breaux as he was leaving Jazz Fest. Daniel Breaux stated he did not have any money and turned to walk away. John Duncan approached him from behind and shot him at close range in the back of the head with a firearm. Daniel Breaux was unarmed.

- John Duncan was tried and convicted on 3/23/2005 of second-degree murder.

- John Duncan's conviction was overturned on appeal and a new trial commenced on 3/16/2010.

- The jury returned a verdict of guilty as charged to second-degree murder on 3/22/2010.

- John Duncan was sentenced to juvenile life until his 31st birthday.

- The AFIS fingerprint cards for John Duncan's 3/22/2010 conviction are true and accurate.

- The AFIS fingerprint cards for John Duncan's arrest on 1/26/2022 are true and accurate.

- The John Duncan on trial in case number 554-390, whose date of birth is July 13, 1989, is one and the same John Duncan who was convicted of second-degree murder for the killing of Daniel Breaux on 3/22/2010.

During trial, the joint stipulation was mentioned multiple times, including during voir dire, opening statements, questioning of multiple witnesses, and closing arguments.

Additionally, the State called Jason Cuccia, an assistant district attorney,[1] as a witness at trial in this matter to testify concerning Mr. Duncan's 2010 second-degree murder conviction. Mr. Cuccia was the prosecutor in the previous second-degree murder case against Mr. Duncan, which resulted in a 2010 guilty verdict. When the State questioned Mr. Cuccia regarding the facts of the previous case, the defense made a hearsay objection. The district court overruled the objection, citing its previous ruling on the La. C.Cr.P. art. 404(B)(1) motion. Mr. Cuccia then testified that the facts underlying the previous conviction were as follows:

> Mr. Duncan actually approached a victim who was leaving out of Jazz Fest. As he approached the victim, he attempted to arm rob him. The victim, ignored him, kept walking, and Mr. Duncan then produced his handgun, aimed it at the back of the victim's head, and shot him dead.

Mr. Cuccia confirmed that the previous case had gone to trial twice; a new trial was granted because "a judge had found that evidence hadn't properly been disclosed to the Defense." Mr. Cuccia also confirmed that three other persons were indicted in the previous crime.

In addition to Mr. Cuccia, the State, at the April 2024 jury trial in this matter, called the following nine witnesses:

- New Orleans Police Department ("NOPD") Officer Jonathan Enamorado-Villato—the first officer on the crime scene;

- NOPD Detective Lucretia Gantner—the lead homicide detective on the case;

- Sprite Kiger—an eye witness;

- Joe Fertitta—Mr. Duncan's boss;

- David Doyle—Mr. Duncan's co-worker on date of crime;

---

[1] Mr. Cuccia is currently employed as an assistant district attorney in St. Tammany and Washington Parishes; he previously was employed as an Orleans Parish assistant district attorney.

- Kenneth Leary—Firearms and ballistics identification expert;

- Charles Dionne—NOPD crime analyst and expert in cell data analysis;

- Dr. Samantha Huber—Coroner's Office Chief forensic pathologist; and

- Donald Julien—custodian of the jail calls for Sheriff's Office.

The State also introduced over thirty exhibits, including the 911 calls; surveillance videos from various sources; Mr. Duncan's recorded interview following his arrest; autopsy and crime scene photographs; and employment records of Mr. Duncan and his co-worker, Freddie Williams. The defense rested without calling any witnesses. As noted elsewhere in this opinion, the defense introduced a map of cell towers in the crime scene area.

The jury unanimously found Mr. Duncan guilty as charged on all three counts and answered affirmatively to invoke firearm sentencing provisions. Mr. Duncan filed motions for a post-judgment verdict of acquittal and new trial.[2] The district court denied both motions. The district court held a sentencing hearing, following which it sentenced the Mr. Duncan to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for second-degree murder; forty years imprisonment at hard labor for obstruction of justice; and twenty years imprisonment at hard labor without benefit of probation, parole or suspension of sentence and a $1,000 fine for possession of a firearm by a convicted felon. This appeal followed.

---

[2] The district court, in denying the motion for new trial, ruled that the evidence of other crimes was correctly "deemed to be highly probative to prove intent, and the Court believes that it did not prejudice the defendant." In addition to proving intent, the district court found the crime's admissibility was also justified to prove motive; "it appeared that the similar motive in the crimes was the shooting of a victim, specifically from behind in the back of the head. And, again, you know, the target was always shot from the back."

**Statement of the evidence presented at trial**

This case stems from a murder that occurred on December 17, 2021, at approximately 4:27 p.m.—the time of the two 911 calls reporting the shooting. Officer Enamorado-Villato was one of the first responding officers to arrive on the crime scene—a city bus stop located at the corner of North Broad Street and Domaine Street. When Officer Enamorado-Villato arrived, he observed a man at the bus stop slumped over in a wheelchair and blood on the ground. Video from Officer Enamorado-Villato's body worn camera was played for the jury, showing the scene upon his arrival and depicting several pedestrians on the scene.

Approximately a half hour after the shooting, Detective Gantner—the lead homicide detective—arrived at the scene. By that time, Mr. Rogers had been removed from the scene and pronounced dead. A subsequently performed autopsy, by Dr. Huber, determined Mr. Rogers' cause of death to be multiple gunshot wounds.[3] Dr. Huber collected seven projectiles during the autopsy. The police collected multiple casing at the crime scene. Ballistic testing of the projectiles and casings, by Mr. Leary, determined that all the bullets were fired from the same weapon—a .25 caliber, small gun.[4]

---

[3] Dr. Huber, who was qualified as an expert in forensic pathologist, testified that Mr. Rogers sustained multiple gunshot wounds to the head and collected seven projectiles. Dr. Huber confirmed that Mr. Rogers was a paraplegic who was missing a spleen and kidney from a 2014 gunshot wound.

[4] Mr. Leary, who was qualified as an expert in the field of firearms and tool mark identification, testified that he examined six fired .25 auto cartridge cases recovered from the crime scene, "six unknown caliber copper jacketed and brass jacketed projectiles … and one unknown caliber brass jacketed projectile" recovered from Mr. Rogers during the autopsy. Mr. Leary determined the cases were all fired from the same weapon based on the same class characteristics and individual markings. Further, Mr. Leary determined some of the projectiles found in the autopsy were fired from a .25 caliber weapon, but at least one was so damaged it was not possible to make this determination. Mr. Leary testified that the shell casings were swabbed for DNA before his examination, but it was not his job to test for gunshot residue or DNA. The record reflects that the spent casings were not tested for gunshot residue or DNA.

There were two eye-witnesses to the shooting—Ms. Kiger and Jermaine Stovall. Neither witness could identify the shooter.[5]

When the shooting occurred, Ms. Kiger testified she was a passenger in a sports utility vehicle ("SUV") in the curbside lane on North Broad Street. Traffic was moving slowly, and her car window was rolled down. She was about ten to fifteen feet from the shooting. Ms. Kiger initially noticed a man at the bus stop sitting in a pink wheelchair. She observed another man approach the man in the wheelchair from behind, and then she heard what she thought was gunshots. The man in the wheelchair then slumped forward. Ms. Kiger asked her roommate, who was driving the SUV and who did not see the shooting, to go around the block and return to the scene to check on the man in the wheelchair. When they returned to the scene, the shooter was running back in the direction from which he had come. Ms. Kiger waited at the scene to speak to Detective Gantner.

Ms. Kiger testified that she is an artist and that she pays attention to details. The details she described to the detective regarding the shooter included that he was tall and thin, that he was in his 20's, and that he was wearing tight clothes (skinny jeans) and a white T-shirt. She described the shooter's T-shirt as having a logo on it that referred to some type of line work. She made multiple comments

---

[5] Only Ms. Kiger testified at trial; Mr. Stovall did not. Detective Gantner interviewed Ms. Kiger only at the scene. Detective Gantner interviewed Mr. Stovall on December 21, 2021, four days after the murder and one day after the arrest warrant was issued for Mr. Duncan's arrest. Whether Detective Gantner spoke to Mr. Stovall at the scene is unclear from the record. But, Mr. Stovall was the reference point in all the videos the detective found capturing the scene. Detective Gantner confirmed that Mr. Stovall told him that the shooter made some sort of movement to indicate that he was not going to do anything to Mr. Stovall.

A third witness, unidentified by name, spoke to another homicide detective who was at the scene—Detective Alcala—and described the man that the witness saw running from the scene as wearing a black bandana on his face.

regarding the shooter's hair; she described his hair as shoulder-length; "gorgeous";

and "very curly," not dreads. She did not believe the shooter had dreads because of

the shine of his hair; she noted that generally dreads "tend to be a little bit . . .

duller in color." She did not notice if the shooter had any tattoos, scarf, gaiter, or

holster. She did not remember if the shooter was wearing a face covering. She

stated that she did not see any designs on the shooter's face. But, she

acknowledged that she did not get a great look at the shooter's face.

After securing the crime scene, collecting evidence from the scene, and

speaking to the witnesses, Detective Gantner canvassed the area searching for

surveillance video. Detective Gantner secured video from three separate sources:

- The Magnolia Meat Market, which was located on the opposite corner of the same side of Broad Street as the bus stop;

- The church at 2720 Dumaine Street, which was across from the bus stop on Broad Street (two videos from the church were obtained); and

- Real Time Crime Camera ("RTCC") footage from the corner of Dumaine and Dorgenois Streets (the "RTCC Scene Video").

Capturing the murder, the Magnolia Meat Market and the church videos

depict, from different angles, a masked man wearing a white T-shirt and dark pants

walk up to the bus stop and approach Mr. Rogers from behind. Mr. Rogers is

sitting in a pink wheelchair under the bus stop canopy. After shooting Mr. Rogers

from behind, the masked man runs down Dumaine Street toward Dorgenois Street

from where the man had come. Mr. Stovall appears in the videos standing in front

of the Magnolia Meat Market; he runs away from the bus stop as the shooter

approaches.

The RTCC Scene Video shows the masked man walk down Dorgenois

Street to Dumaine Street and go off camera. Seconds later, the same masked man

reappears and runs down Dumaine Street towards Dorgenois Street. Triangulating these videos, Detective Gantner explained, demonstrates that the shooter in the Magnolia Meat Market and church videos is the masked man in the RTCC Scene Video. Again, the shooter leaves the RTCC Scene Video shortly and is picked up immediately by the surveillance cameras that capture the shooting; seconds later, the masked man is picked up again on the RTCC Scene Video running back in the same direction from which the masked man had come.

In reviewing the videos, Detective Gantner honed in on what she believed to be unique about the masked man that could help her identify him. The unique feature, which proved to be pivotal in her identifying the masked man, was the "All Dry" company logo printed on the back of the white T-shirt that the man was wearing.[6] Based on an internet search, Detective Gantner located a local water-damage restoration company by that name—All Dry Fire and Water Restoration and Mold Remediation ("All Dry").

Following up on the T-shirt lead, Detective Gantner spoke with two All Dry representatives—one of All Dry's owners, Paul Christiana;[7] and one of All Dry's permanent employees, Mr. Doyle.[8] Both identified the T-shirt that the masked man was wearing in the RTCC Scene Video as belonging to All Dry. They informed Detective Gantner that All Dry distributes its T-shirts with the logo to both permanent and temporary employees. Mr. Doyle described the logo as "very noticeable." The purpose of the T-shirts, Mr. Doyle explained, was to identify the

---

[6] The videos also showed that the masked man was wearing an Atlanta Braves hat.

[7] Although Detective Gantner also spoke to a third All Dry representative—a female owner of the company, no further information regarding that conversation is in the record.

[8] Although Mr. Doyle testified at trial, Mr. Christiana did not.

workers on jobsites and for the workers to look uniform and professional. According to Mr. Doyle, the company orders the T-shirts in bulk; and he had some stored in a shed. Detective Gantner acknowledged that Mr. Christiana told him he had seen a homeless person wearing an All Dry T-shirt. No attempt was made to determine how many of those T-shirts All Dry had distributed.

Although Mr. Christiana identified the T-shirt the man was wearing in the RTCC Scene Video as belonging to All Dry, he was unable to identify the man as one of his permanent employees. Instead, Mr. Christiana explained to the detective that he believed the man was one of All Dry's temporary employees. All Dry, Mr. Christiana explained, used two temporary employment agencies—All Time Staffing Temp Service ("All Time"),[9] located on Ursuline Avenue and North Broad Street and managed by Mr. Fertitta; and another company managed by Mr. Lamont. Although Mr. Christiana provided the detective with Mr. Lamont's name, Mr. Christiana informed the detective that he did not believe the man in the video was one of Mr. Lamont's employees. Rather, he told the detective that he believed the man was one of Mr. Fertitta's (All Time's) employees.

According to Detective Gantner, Mr. Christiana reached out and determined the identities of the two All Time employees that worked for All Dry on the day of the shooting were Mr. Duncan and Mr. Williams. Mr. Christiana provided the detective with those two temporary employees' names as well as All Time's manager's name (Mr. Fertitta).[10] Detective Gantner accepted Mr. Christiana's

---

[9] In Detective Gantner's testimony, the temporary agency is referred to as "All Temp." But, it is undisputed that the correct name of the temporary agency where Mr. Duncan worked on the date of the shooting is All Time Staffing Temp Service, which we refer to as "All Time."

[10] Mr. Fertitta actually placed five temporary workers with All Dry on December 17, 2021. Two were Mr. Duncan and Mr. Williams, who were working together with Mr. Doyle at Children's Hospital; the other three were sent to work at a different work site in LaPlace.

opinion that the man in the video was not a permanent employee of All Dry and that he was not one of Mr. Lamont's temporary employees. The only permanent employee of All Dry that Detective Gantner contacted was Mr. Doyle.

According to Mr. Doyle, his first interaction with Mr. Duncan was on December 16, 2021. Mr. Doyle testified that he worked alongside with Mr. Duncan and Mr. Williams on Thursday, December 16, and Friday, December 17. Mr. Doyle confirmed that Mr. Duncan was a good worker and that "nothing else really stuck out" about him. Mr. Doyle testified that he did not notice a gun on Mr. Duncan's person.[11] Mr. Doyle further testified that he expected Mr. Duncan to return to work on Monday, December 20. But, he never saw him again.

Detective Gantner followed up with Mr. Fertitta. At Detective Gantner's request, Mr. Fertitta provided her with the employment records of his two employees—Mr. Williams and Mr. Duncan—that worked in New Orleans for All Dry on the date of the murder. He produced these employees' employment applications, photo identification cards, and time sheets. Mr. Williams' Louisiana Identification Card showed that he was a bald man and that he had a beard that was predominantly gray. This narrowed the number of potential suspects that worked as temporary employees for All Dry on the day of the murder to one—Mr. Duncan.

In her meeting with Mr. Fertitta, Detective Gantner asked him to watch, on a cell phone, the RTCC Scene Video. She neither showed Mr. Fertitta the videos depicting the shooting nor questioned him about the shooting. Mr. Fertitta testified that he needed to look at the video "a couple of times" before he identified Mr. Duncan in the video based on his "hairdo."

---

[11] Mr. Doyle identified the trio—him, Mr. Williams, and Mr. Duncan—in the Shell convenience store surveillance video, discussed elsewhere in this opinion.

At trial, Detective Gantner acknowledged that when Mr. Fertitta first saw the back of the person approaching Dumaine Street and North Broad Street on the video, he stated that it was not Mr. Duncan and that he thought it looked more like Mr. Williams. The detective then reminded Mr. Fertitta that Mr. Williams was a bald male and asked Mr. Fertitta to watch the entire video. According to Detective Gantner, she "asked him to watch the full video so he can see the suspect returning down Dumaine." When Mr. Fertitta saw the front of the man in the video, Mr. Fertitta identified him as Mr. Duncan.

At trial, Mr. Fertitta testified that he did not remember telling the detective that the man in the video was not Mr. Duncan. But, Mr. Fertitta acknowledged that he "had to look at [the video] a couple of times" and that he identified Mr. Duncan in the video based on "his hairdo." Mr. Fertitta emphasized that he knew nothing about the shooting.

Mr. Fertitta also informed Detective Gantner that he had known Mr. Duncan's father—John Duncan, Sr.—for fifteen to twenty years. Mr. Fertitta testified that All Dry ordered temporary workers five or six times after Hurricane Ida, which was in August 2021. Mr. Fertitta explained that he accepted job applications from anyone with a valid identification and a social security card and that he only performed background checks if requested by an employer. All Dry did not require background checks.[12] Mr. Fertitta acknowledged that the

_____

[12] Detective Gantner confirmed that Mr. Christiana, when she spoke to him another time, Googled Mr. Duncan's name and was surprised to find out that Mr. Duncan had a prior second-degree murder conviction. Although Detective Gantner confirmed that she learned about Mr. Duncan's previous conviction at the beginning of her investigation, she acknowledged that information was not included in her report. And, she testified that it did not impact her investigation.

individuals he employed often worked a day or two and then did not return to work.

From his questioning of All Dry and All Time representatives, Detective Gantner determined three additional facts. First, the place Mr. Doyle, Mr. Duncan and Mr. Williams (the "Trio") worked on the day of the murder was Children's Hospital in New Orleans. Second, before going to Children's Hospital on the morning of the murder, the Trio stopped at a Shell Convenience Store (the "Shell Station") located approximately a half a mile away from All Dry's office.[13] Third, on the day of the murder, Mr. Duncan was driving an older model, white Lincoln car (the "Lincoln").[14]

Based on the information she learned from investigating the case, Detective Gantner secured additional surveillance video from three places:

- RTCC footage showing Mr. Duncan driving the Lincoln around the City on the date of the shooting;

- Surveillance footage from the Shell Station that the Trio stopped at on the way to work on the morning of the shooting; and

- Surveillance footage from the barbershop that Mr. Rogers visited before going to the bus stop on the afternoon of the shooting.

As to the Lincoln, RTCC footage from North Broad Street and Orleans Avenue on December 17, at 6:45 a.m., captured the vehicle driving on North Broad Street towards Ursuline Avenue. RTCC footage from Ursuline Avenue and Crete Street on December 17, beginning at 6:44 a.m., captured the Lincoln parked in

---

[13] Mr. Fertitta testified that he dropped off the temporary employees at All Dry's office for them to get their work assignments.

[14] Mr. Fertitta confirmed that Mr. Duncan was driving the Lincoln on Black Friday—the day after Thanksgiving—at Lakeside Mall during a prior work assignment. Mr. Fertitta was inside that vehicle with Mr. Duncan that day looking for a parking place at the mall.

front of All Time, and Mr. Duncan arriving at work and walking inside All Time. These events occurred before the Trio stopped at the Shell Station.

On the afternoon of December 17, at 3:59 p.m., RTCC footage from Ursuline Avenue and Crete Street captured the Lincoln returning to All Time. Mr. Duncan is captured exiting the driver's side of the Lincoln and walking to All Time, waiting outside for approximately two minutes, returning to the Lincoln, entering the driver's side, and driving away. RTCC footage from North Broad Street and Orleans Avenue on December 17, at 4:05 p.m., captured the Lincoln driving on North Broad Street heading towards Tulane Avenue. According to Detective Gantner, a path from All Time to Broad and Orleans would take Mr. Duncan directly past Mr. Rogers, who was sitting at the bus stop.[15] But, no video footage of the Lincoln in the area of the crime scene was produced at trial.

As to the Shell Station, Detective Gantner visited the Shell Station and obtained videos from the interior and exterior of the store. The Shell Station videos captured the Trio, on the morning of the shootings, arrive at the store in an All Dry van, enter the store, walk in the store, and exit the store.

The State also introduced the video surveillance from the interior and exterior of the barbershop that Mr. Rogers visited about an hour before the shooting. No one at the barbershop was willing to speak to Detective Gantner beyond confirming that Mr. Rogers had visited the barbershop before the shooting. According to Detective Gantner, the barbershop video coupled with the other

_____

[15] As discussed elsewhere in this opinion, surveillance footage from the barbershop where Mr. Rogers went earlier establish Mr. Rogers' presence at the bus stop at this time.

videos of the scene demonstrate that Mr. Rogers was at the bus stop when Mr. Duncan was going to and from All Time.

Lastly, the State presented a surveillance video compilation. This compilation had three side-by-side panels. The first two panels were views of Mr. Duncan inside the Shell Station. The third panel was a snippet from the RTCC Scene Video depicting the masked man walking to the bus stop. The compilation allowed a side-by-side comparison of Mr. Duncan at the Shell Station on the morning of the shooting (the left and middle panes) and the masked man (the right pane) walking to the bus stop. According to Detective Gantner, Mr. Duncan had a very distinct gait—way of walking. Detective Gantner described it as a "kind of side-to-side motion[,]" "kind of a swaying side-to-side." Detective Gantner also testified that Mr. Duncan's hairstyle was similar.

Based on the evidence she collected, Detective Gantner, three days after the shooting, obtained an arrest warrant for Mr. Duncan and search warrants for the Lincoln and the two addresses associated with the phone numbers on Mr. Duncan's All Time employment application. One of those addresses was his mother's house where Mr. Duncan was living.

After securing the arrest warrant, Detective Gantner arranged for Mr. Fertitta and All Time's owner—Kim Bienvenue—to participate in a photo lineup of Mr. Duncan. Detective Gantner explained that she had the lineup done to confirm both of them actually knew Mr. Duncan. Both chose Mr. Duncan's photo from the

14

lineup. Neither of them knew anything about the shooting. No other lineups were conducted.

Based on a call from Mr. Duncan's father, Mr. Duncan was arrested about five weeks after the shooting, in late January 2022. At the time of his arrest, Mr. Duncan was inside the Lincoln. In the search of the Lincoln, police found three things: (i) a black and white camouflage-patterned gaiter-face covering; (ii) a small gun holster; and (iii) a broken black cell phone. The gaiter was found under the car seat. Detective Gantner maintained that the gaiter was a match for the one in the RTCC Scene Video. The holster was found in the trunk. Mr. Leary testified that the .25 caliber gun used to commit the crime could have fit in that holster.[16] The broken cell phone found in the Lincoln was determined to be a Samsung. Mr. Dionne confirmed the model phone that Mr. Duncan's phone number was associated with was a Samsung A12, which was the same as the cell phone found in the Lincoln. Although the shooter was wearing an Atlanta Braves hat, the hat was not found in the search of either the Lincoln or Mr. Duncan's mother's house.[17]

Shortly after his arrest, Mr. Duncan was interviewed by Detective Gantner. The interview was videotaped and played for the jury. In the interview, Mr.

---

[16] Mr. Leary could not state with certainty what caliber gun the holster found in the Lincoln could hold. But, he testified that a .25 caliber weapon is a "small caliber hand gun . . . that usually can fit in a palm of an adult[']s hand." He also testified that the holster "shows signs of wear, and you can also see an imprint of the shape of a gun." The holster was neither swabbed for DNA nor tested for gunshot residue.

[17] Although it is undisputed that Mr. Duncan's mother's house was searched, no return for the search was made.

Duncan lied about at least two things—his employment and his vehicle. Insofar as his vehicle, he told the detective he was borrowing the Lincoln and had only had it for three days. But, his boss (Mr. Fertitta) stated that Mr. Duncan had the Lincoln since at least Black Friday; and the videos show that he was driving the Lincoln on the date of the shooting. Mr. Duncan also lied about his employment—working at All Time or All Dry. In the interview, Mr. Duncan told the detective that since he was released from prison in late 2019, he had worked at Goodwill and other temporary jobs, but he would not share any specifics. Mr. Duncan also denied having a gun.

The State published five jail calls between Mr. Duncan and his family that he made shortly after his arrest.[18] During one of these calls, Mr. Duncan complained that "he gave these people big, big, big, big evidence" ("Big Evidence"). Mr. Duncan here is referring to his father who made the call that led to his arrest in the Lincoln. Detective Gantner linked the Big Evidence that Mr. Duncan referenced to the "gaiter that is worn by the shooter fleeing the homicide scene" and the small gun holster that were found in the Lincoln. On another call, Mr. Duncan stated: "they don't see me with no gun. Don't see pull me pulling the trigger. Nothing." Similarly, a family member—Mr. Duncan's mother—told Mr.

---

[18] Mr. Julien, who was custodian of the jail calls for Orleans Parish Sheriff's Office, testified that he was a technician for Securus. Securus is a company that manages jail calls across the country, including at the Orleans Parish Sheriff's Office. In his role as a Securus technician, Mr. Julien testified that he can request past jail calls based on the prisoner's name and unique personal identification number. He requested five jail calls between Mr. Duncan and family members—all made shortly after his arrest (in late January and early February 2022). Mr. Julien testified that he did not listen to calls and was not otherwise involved in this case.

Duncan during a call the following: "they got you walking down and running back."

Detective Gantner also secured a search warrant for Mr. Duncan's cell phone records[19] and submitted those records to a crime analyst in the NOPD Analytics Section, Mr. Dionne.[20] The phone data analysis showed that Mr. Duncan was in the area of the shooting at the time of the crime—a point not in dispute given All Time's location only blocks from the shooting. But, the defense introduced a map with the address of the cell towers that (arguably) indicated calls from Mr. Duncan's cell phone were connecting to cell phone towers moving away from the crime scene at the time of the shooting.

Detective Gantner was unable to develop a motive for the shooting. No evidence was found to indicate that Mr. Duncan and Mr. Rogers previously knew either other.[21] Mr. Rogers previously had been shot in 2014, which was when Mr. Duncan was still in prison. Detective Gantner acknowledged that she was unaware of this fact until she heard Dr. Huber's testimony at trial. No one reported seeing either Mr. Gantner or Mr. Rogers with a gun. The gun used to shoot Mr. Rogers was never recovered.

---

[19] Although records for two phone numbers were requested, one of those phone numbers belonged to Mr. Duncan's mother and, thus, was not relevant.

[20] Mr. Dionne, who was qualified as "an expert in the field of telephone records, cell site, [and] cell data analysis," testified he analyzed the call and text records from 4:00 p.m. to 6:00 p.m. on December 17, 2021 (the day of the shooting). Mr. Duncan made a number of calls before and after the shooting that connected to cell phone towers near the crime scene. Mr. Dionne testified that he could neither determine how many people are using a phone, nor the strength of the individual towers a cell phone might connect to.

[21] The only potential evidence of them knowing each other is that Ms. Kiger testified that before the shooting she could hear the perpetrator talking to Mr. Rogers as if they knew each other, but she could not make out the exact words.

## **DISCUSSION**

**Errors Patent**

Pursuant to La. C.Cr.P. art. 920(B),[22] we have reviewed the record for errors patent and find none.

**Assignment of Error No. 1: The State failed to present sufficient evidence to uphold the convictions.**

Mr. Duncan's first assigned error is that the evidence was insufficient to convict him of any of the three offenses. The standard of review that governs the determination of sufficiency of the evidence to support a conviction is stated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979), and codified in La. C.Cr.P. art. 821(B).[23] When assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Jackson, supra*. This review must include the whole record, as a rational fact finder does. *State v. Gibson*, 15-0682, p. 13 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780.

"It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Johnson*, 619 So.2d 1102, 1109 (La. App. 4th Cir. 1993) (citing *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986). " 'A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.' " *Gibson*, 15-

---

[22] La. C.Cr.P. art. 920 provides that "[t]he following matters and no others shall be considered appeal: (1) An error designated in the assignment of errors; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

[23] La. C.Cr.P. art. 821(B) provides that "[a] post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty."

0682, p. 13, 186 So.3d at 780 (quoting *State v. Smith*, 600 So.2d 1319, 1324 (La. 1992)). "[C]redibility determinations, as well as the weight to be attributed to the evidence," fall soundly within the province of the fact finder. *State v. Brumfield*, 93-2404, pp. 5-6 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316.

"When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' " *State v. Neal*, 00-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657 (quoting La. R.S. 15:438). As this Court has observed, "the standard found in La. R.S. 15:438 is not a stricter standard than 'the more general rational juror's reasonable doubt formula,' *i.e.*, the *Jackson v. Virginia* standard." *State v. McDonough*, 22-0628, p. 23 (La. App. 4 Cir. 10/27/23), 376 So.3d 1003, 1020, *writ denied*, 23-01546 (La. 9/4/24), 391 So.3d 1048 (quoting *State v. Toups*, 01-1875, p. 3 (La. 10/15/02), 833 So.2d 910, 912). The standard set forth in La. R.S. 15:438 "serves as 'an evidentiary guide for the jury when considering circumstantial evidence.' " *Id*.

> Addressing this standard, the Louisiana Supreme Court has observed:
>
> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*.

*State v. Davis*, 92-1623, p. 9 (La. 5/23/94), 637 So.2d 1012, 1020 (emphasis omitted). "Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson*" to prove guilt beyond a reasonable doubt to a rational jury. *Rosiere*, 488 So.2d at 968.

Here, Mr. Duncan does not dispute that Mr. Rogers was killed. Rather, he asserts the State failed to provide sufficient evidence to prove that he was the perpetrator of the second-degree murder and, thus, failed to prove he committed obstruction of justice or was guilty of being a felon in possession of a firearm. Simply stated, Mr. Duncan frames the issue as whether the State failed to prove he was the individual observed in the videos committing the shooting and, thus, failed to prove his identity as the perpetrator of any of the three offenses.

Mr. Duncan's argument focuses solely on whether the evidence was sufficient to establish his identity as the perpetrator—identity. "[W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *Neal*, 00-0674, p. 11, 796 So.2d at 658. Moreover, "[e]ncompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator." *State v. Lopez,* 23-335, p. 8 (La. App. 5 Cir. 8/21/24), 398 So.3d 167, 176-77, *writ denied*, 24-1187 (La. 1/14/25), 398 So.3d 650. With these principles in mind, we separately address each of Mr. Duncan's three offenses to which he raises a sufficiency of the evidence challenge.

Second-Degree Murder

Second-degree murder is defined, in part, as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). "Specific intent may be proven by direct evidence, such as statements by a

20

defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances." *State v. Hollins*, 23-0785, p. 4 (La. App. 1 Cir. 3/19/24), 387 So.3d 641, 646, *writ denied*, 24-00487 (La. 10/1/24), 393 So.3d 865 (citing *State v. Meek*, 23-0362, p. 4 (La. App. 1 Cir. 11/9/23), 379 So.3d 67, 71-72).

Mr. Duncan contends that he could not be identified in the surveillance videos, noting the "shooter's face was always covered." He further contends that the State relied upon wholly circumstantial evidence. According to Mr. Duncan, besides the surveillance videos of the offense, the State's other circumstantial evidence consisted of Detective Gantner's incomplete investigation, a map of his phone pings, five jail calls and an interview with Mr. Duncan, and a holster and gaiter found in the Lincoln. He contends that the State was required to exclude every reasonable hypothesis of innocence, but failed to do so. Finally, he complains that her entire investigation was lacking, focusing almost immediately on him without considering any other potential suspects. In essence, Mr. Duncan contends that Detective Gantner had tunnel vision. We find these arguments unpersuasive.

The record reflects that Mr. Rogers, as Dr. Huber testified, sustained multiple bullet wounds to his head, resulting in his death. As the State contends in its brief, "[f]rom this number, pattern, and location of shots, the jury could rationally and reasonably infer the person who fires these shots intends to kill." The State also established at trial that a perpetrator approached Mr. Rogers from behind and shot him at the bus stop, then quickly ran away. The State established this based on surveillance videos and the testimony of its witnesses.

The State introduced evidence establishing that Mr. Duncan's identity as the perpetrator based on the conspicuous logo on the work T-shirt that he was wearing. The State then used identification procedures with people who knew Mr. Duncan—his boss, Mr. Fertitta, and parents—to identify him. The State additionally introduced jail calls in which Mr. Duncan discussed the Big Evidence that was found in the Lincoln, and the RTCC Scene Video of him running away following the shooting. The State further established that the bus stop where Mr. Rogers was shot was just blocks from Mr. Duncan's workplace (All Time) where Mr. Duncan was seen arriving earlier in the day and leaving shortly before the shooting. Also, the jury accepted Detective Gantner's observations that the holster and gaiter found in the Lincoln were evidence buttressing Mr. Duncan's identification as the shooter.

In further support of its case, the State presented a surveillance video compilation. The compilation compared Mr. Duncan's appearance on the morning of the crime at the Shell Station with the masked man in the RTCC Scene Video known to be the shooter. This side-to-side comparison was used to show the jury the distinct similarities in Mr. Duncan's appearance and gait to the masked man. In narrating the compilation video, Detective Gantner testified that the masked man in the RTCC Scene Video was not only wearing the same clothing as Mr. Duncan was wearing in the Shell Station videos, but also had "very similar hair."

Mr. Duncan acknowledges in his appellant brief that he "was somewhat similar in appearance to the shooter." But, he contends that the State failed to exclude the fact that the man in the video is not him, "particularly in light of [Ms.] Kiger's description." As discussed elsewhere in this opinion, Ms. Kiger's description included significant comments regarding the shooter's hair. Mr. Fertitta

also based his identification of Mr. Duncan on his "hairdo." At the time of his arrest, Mr. Duncan had dreads. But, the jury was able to determine, based on Ms. Kiger's and Mr. Fertitta's testimony coupled with its view of the evidence whether Mr. Duncan was the masked man in video who shot Mr. Rogers.

Criticizing Detective Gantner's investigation, Mr. Duncan drew attention at trial to the lack of evidence from phone records, DNA, or GSR analysis. The jury heard those "CSI-type"[24] criticisms at trial. The jury also heard Detective Gantner's responses. For instance, Mr. Duncan criticized Detective Gantner for failing to follow up on potential witnesses, such as the two 911 callers. Detective Gantner, however, responded that neither 911 caller witnessed the shooting. Likewise, Detective Gantner, when asked about a potential third eyewitness, testified that "each one of those addresses that Detective Alcala provided to me, I knocked on the door in an attempt to retrieve video." Mr. Duncan also criticized Detective Gantner for failing to follow up on other All Dry and All Time employees as suspects. In response, Detective Gantner testified that, as lead homicide detective, it is equally as important to eliminate potential suspects, as it is to find the correct suspect.

While Mr. Duncan argues on appeal that the All Dry T-shirts were widely distributed—including being seen worn by a random, homeless person on the street—and thus were not unique, he presented no corroborating evidence to rebut the State's evidence, which was seen by the jury as proof beyond a reasonable

---

[24] *See Fahie v. Virgin Islands*, 858 F.3d 162, 166 (3d Cir. 2017) (observing that "[a]n 'anti-CSI' instruction states, in essence, that the government is not required to 'employ any specific investigation technique [such as fingerprint analysis or DNA testing] or all possible investigative techniques to prove [its] case' " and that "[t]he name by which such instructions are known is a reference to the popular television series 'CSI' and its spinoffs, which feature crime scene investigators using sophisticated forensic techniques to solve crimes").

doubt. Mr. Duncan's argument that there may have been hundreds of All-Dry T-shirts in the city does not present a reasonable hypothesis of innocence. *See State v. Toby*, 22-386, p. 10 (La. App. 3 Cir. 3/8/23), 358 So.3d 289, 298 (observing "while Defendant argues that there were perhaps thousands of people in and around the ULL campus because of its homecoming events, he makes no attempt to develop this argument further, leaving this court to only speculate as to its relevance" and that "[w]ithout more, Defendant's point that there may have been many people in the general vicinity of the murder does not present a reasonable hypothesis of innocence"). Ultimately, the jury rationally accepted the weight of the State witnesses' testimony and evidence indicating that Mr. Duncan was the person who shot Mr. Rogers, over Mr. Duncan's theory of misidentification. Accordingly, as to second-degree murder, this assignment of error lacks merit.

Obstruction of Justice

Mr. Duncan asserts the State presented insufficient evidence to justify his conviction for obstruction of justice.[25] Finding Mr. Duncan's assertion has merit, we vacate his conviction and sentence for obstruction of justice.

In its appellee brief, the State contends Mr. Duncan obstructed justice by fleeing the scene with the gun. As noted elsewhere in this opinion, the gun was never recovered.

---

[25] Mr. Duncan's appellate brief contains a paragraph outlining the basic requirements of the crime of obstruction of justice. But, the brief fails to address how the evidence presented by the State was insufficient to support the charge. "Assignments of error neither briefed nor argued are deemed waived on appeal." *State v. Loving*, 432 So.2d 962, 963 (La. App. 4th Cir. 1983); *see also* Rule 2-12.4, Uniform Rules – Courts of Appeal. Nonetheless, "[w]hen the state's case is devoid of evidence of an essential element of the charged offense, the conviction and sentence must be set aside 'regardless of how the error is brought to the attention of the reviewing court.'" *State v. Thacker*, 14-0418, p. 2 (La. 10/24/14), 150 So.3d 296, 297 (quoting *State v. Raymo*, 419 So.2d 858, 861 (La .1982)). Accordingly, we examine whether the State presented sufficient evidence to support Mr. Duncan's conviction for obstruction of justice.

This Court previously examined the evidence required to sustain a conviction for obstruction of justice as follows:

> La. R.S. 14:130.1 defines obstruction of justice, in pertinent part, as follows:
>
> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United State law enforcement officers.
>
> " 'Specific intent' is the state of mind that exists when circumstances indicate the offender actively desired prescribed criminal consequences to follow his act." *State v. Scott*, 2023-0022, p. 15 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 54, *writ denied*, 2023-01317 (La. 3/19/24), 381 So.3d 707, and *writ denied*, 2023-01318 (La. 3/19/24), 381 So.3d 707 (quoting La. R.S. 14:10(1)). Further, " '[s]pecific intent [to commit obstruction of justice] need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant.' " *Id.* (quoting *State v. Harvey*, 2021-0730, p. 10 (La. App. 4 Cir. 5/25/22), 345 So.3d 1043, 1050.
>
> \*               \*               \*
>
> However, more than the mere removal of evidence from a crime scene is required to support a conviction for obstruction of justice; "the State must also prove that such removal was done with 'the specific intent of distorting the results of any criminal investigation or proceeding that may reasonably prove relevant to a criminal investigation or proceeding.' " *Scott*, 2023-0022, p. 15, 372 So.3d at 54. While specific intent may be inferred from a defendant's actions, this Court has held that the act of removing a firearm from a crime scene, without more, is insufficient "to prove beyond a reasonable doubt that [the defendant] possessed the specific intent to distort the police investigation." *Id.*, 2023-0022, p. 16, 372 So.3d at 55.

In *Scott*, 2023-0022, p. 16, 372 So.3d at 55, the record reflected that the video evidence depicted "[the defendant] fleeing the scene, yet there is no footage of Defendant leaving the rifle at the scene." This Court stated there was no corroborating evidence that defendant intended to distort an investigation, opining:

> The hypothesis that Defendant had the specific intent to distort the results of the police investigation when he left the crime scene is contradicted by the fact that he left behind shell casings (instead of collecting the shell casings ejected from his rifle), video surveillance (instead of destroying the video surveillance that documented his presence in the neighborhood shooting at the SUV), and witnesses (instead of 17 harming the witnesses that were outside on the street at the time of the shooting incident). From this evidence, a rational juror could have inferred that, in taking the firearm with him, Defendant gave no thought to interfering with the results of a criminal investigation or proceeding.

*Id.*, 2023-0022, pp. 16-17, 372 So.3d at 55. As such, this Court vacated defendant's conviction for obstruction of justice. *Id.*, 2023-0022, p. 17, 372 So.3d at 55.

After *Scott*, this Court re-examined the issue in *State v. Alexander*, 2023-0540, p. 17 (La. App. 4 Cir. 4/23/24), 401 So.3d 105, 115-16, *writ denied*, 2024-00665 (La. 12/11/24), 396 So.3d 968, wherein the defendant deleted the record of a single phone call from his phone, in addition to removing the murder weapon from the scene, which would have revealed that he called a taxi cab "requesting to be transported to the area [of the crime scene shortly before] the murder occurred." This Court found that the totality of defendant's actions indicated his specific intent to destroy evidence of his presence at the crime scene, notwithstanding his admission to detectives that he called the taxi during subsequent questioning. *Id.*, 2023-0540, pp. 17-18, 401 So.3d at 116.

*State v. White*, 24-0385, pp. 22-25 (La. App. 4 Cir. 5/14/25), ___ So.3d ___, ___, 2025 WL 1415587, *12-13.

Applying the above principles, we vacated the *White* defendant's conviction for obstruction of justice, finding there was no evidence to substantiate the charge other than the defendant presumably discarding the murder weapon. *White*, 24-0385, p. 25, ___ So.3d at ___, 2025 WL 1415587, *13. Following *White,* this Court again found that evidence that the defendant presumably fled the scene with

26

the murder weapon was insufficient. *State v. Bowie*, 24-0700, p. 10 (La. App. 4 Cir. 7/1/25), ___ So.3d ___, ___, 2025 WL 1806684, *___.

Like the defendants in *White* and *Bowie*, the sole evidence presented in this case the State relied upon to establish the obstruction of justice claim was that Mr. Duncan allegedly discarded the gun that he used to shoot Mr. Rogers in order to impede the investigation. As discussed above, more than the mere removal of the weapon from the crime scene is required. Accordingly, we find the State presented insufficient evidence to support the conviction of obstruction of justice. We vacate this portion of Mr. Duncan's conviction and sentence.

Possession of a Firearm by a Convicted Felon

The governing statute defining possession of a firearm by a convicted felon is La. R.S. 14:95.1, which provides that "[i]t is unlawful for any person who has been convicted of … a crime of violence … to possess a firearm or carry a concealed weapon." Second-degree murder is a crime of violence. La. R.S. 14:2(B)(3). "To convict a defendant of possession of a firearm, the State must prove: (1) possession of a firearm; (2) conviction of an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense." *State v. Powell*, 15-0218, p. 9 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, 727.

Mr. Duncan contends that the State failed to produce sufficient evidence that he was a convicted felon in possession of a firearm. Again, he contends that "[b]ecause the State failed to prove [Mr. Duncan] was the man in the video, the State also failed to prove [Mr.] Duncan possessed a firearm."

But, Mr. Cuccia testified to Mr. Duncan's 2010 second-degree murder conviction. The parties jointly stipulated to his 2010 conviction, introducing

27

certified copies of the minutes from the trial along with Mr. Duncan's fingerprints. As discussed elsewhere in this opinion, the jury in this case, after viewing the multiple surveillance videos and hearing the State witnesses' testimony, found that Mr. Duncan was the perpetrator in the case in which Mr. Rogers was shot to death at a bus stop. The evidence sufficed to show Mr. Duncan shot and killed Mr. Rogers; hence, it sufficed to show he possessed the firearm—the instrumentality used to commit the murder. Thus, the State presented sufficient evidence to support Mr. Duncan's conviction for being a convicted felon in possession of a firearm. Accordingly, we find, as to possession of a firearm by a convicted felon, this assigned error lacks merit.

**Assignment of Error No. 2—The trial court erred in ruling the 404B evidence admissible.**

Mr. Duncan maintains the district court erred by permitting the introduction of the facts forming the basis for his conviction for second-degree murder when he was fourteen years old. Mr. Duncan avers the evidence was more prejudicial than probative, as the details of the crime were not relevant to proving the State's case.

La. C.E. art. 404(B)(1)(a) provides:

B. Other crimes, wrongs, or acts; creative or artistic expression. (1)(a) Except as provided in Article 412 or as otherwise provided by law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403.

Mr. Duncan asserts that "none of those [404(B)] factors [motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident] were at issue in this case." As to intent and motive, Mr. Duncan maintains "intent to kill was not an issue in this case," and unlike the previous conviction, "robbery is not suggested as a motive." On the other hand, the State avers "[t]he list of purposes for admitting 404(B) evidence is 'non-exhaustive.' " Further, the State contends the evidence was probative as to the identity of Mr. Duncan.

Here, the district court ruled in favor of the State's favor, allowing the introduction of Mr. Duncan's previous second-degree murder conviction, stating:

> [T]he State of Louisiana has shown this Court the reasons why this, this prior bad act, should be admissible to show what they have indicated before: motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or accident. … Particularly hearing that the offenses were very similar in what the State has said in it's response to your reply and said this morning orally in both of the matters Mr. Duncan is alleged to have gone up to an unarmed victim and shot him in the back of the head. And so for those reasons, I believe that this information is highly probative.

"A district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, p. 18 (La. 12/1/16), 217 So.3d 283, 296. "[E]ven when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense." *Id*., 16-1124, p. 12, 217 So.3d at 292. Additionally, " 'where the element of intent is regarded as an essential ingredient

of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act charged was committed.' " *State v. Clanton*, 19-0316, p. 6 (La. App. 4 Cir. 11/6/19), 285 So.3d 31, 36 (quoting *Taylor*, 16-1124, p. 16, 217 So.3d at 294-95).

The State was required to introduce Mr. Duncan's previous conviction as the predicate offense element for the charge of a felon in possession of a firearm. Thus, the conviction was a "material fact at issue" with "substantial relevance independent from showing defendant's general criminal character." *See Taylor*, 16-1124, p. 12, 217 So.3d at 292. But, factual details of the prior crime were not required to prove intent. The assailant shooting Mr. Rogers numerous times in the head demonstrated the intent necessary for the second-degree murder charge, as pointing a gun and firing it supports the finding of specific intent to kill. *See State v. Scott*, 09-0138, p. 8 (La. App. 4 Cir. 11/18/09), 26 So.3d 283, 289. Furthermore, Mr. Duncan made no suggestion that the shooting was an accident. Therefore, Mr. Duncan's history of shooting a victim from behind was not probative of his intent in this case. As such, the details on how, where, and when Mr. Duncan's previous second-degree murder crime occurred, as described during Mr. Cuccia's testimony, were more prejudicial than probative. Moreover, Detective Gantner testified she was unable to develop a motive or establish a previous relationship between Mr. Duncan and Mr. Rogers; thus, motive cannot be used to justify the admission of the evidence.

Accordingly, evidence of Mr. Duncan's prior conviction without detail was admissible to prove Mr. Duncan's past conviction for the purposes of the felon in possession of a firearm charge, but the additional details were unnecessary based on their unduly prejudicial nature.

***Harmless Error***

"It is well-settled law that an error in the admission of other crimes evidence is subject to the harmless error rule." *State v. Hunter*, 22-0742, p. 9 (La. App. 4 Cir. 7/6/23), 371 So.3d 108, 115. In *State v. Thomassie*, 16-0370, pp. 11-12 (La. App. 4 Cir. 12/21/16), 206 So.3d 311, 318, we defined the harmless error standard as follows:

> " 'Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational fact finder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant's jury.' " [*State v.*] *Campbell*, [20]15-0017, p. 27 [(La. App. 4 Cir. 6/24/15),] 171 So.3d [1176,] 192 (quoting *State v. Gibbs*, 41,062, p. 8 (La. App. 2 Cir. 6/28/06), 935 So.2d 349, 354); [*State v.*] *Dove*, [20]15–0783, p. 30 [(La. App. 4 Cir. 5/4/16)], 194 So.3d [92], 112, n. 3. *See also Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Stated otherwise, harmless error exists when the guilty verdict actually rendered was "surely unattributable" to the error. *State v. Higginbotham*, [20]11-0564, p. 3 (La. 5/6/11), 60 So.3d 621, 623. "A trial error ... may 'be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' " *State v. Merwin*, [20]15-0681, p. 18 (La. App. 4 Cir. 1/27/16), 186 So.3d 759, 769 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 308-09, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

While Mr. Duncan's previous conviction was mentioned frequently throughout the trial, the State presented ample inculpatory evidence, including an eyewitness account of the shooting, surveillance videos, identification procedures, physical evidence found in the Lincoln (Mr. Duncan's car), cell phone location data, and jail call recordings to support Mr. Duncan's second-degree murder conviction. As such, we find the introduction of the details of Mr. Duncan's prior conviction, even though more prejudicial than probative, was harmless given the weight of all other evidence the jury considered.

## **DECREE**

For the foregoing reasons, we find insufficient evidence was presented as to Mr. Duncan's intent to justify a conviction for obstruction of justice. Accordingly, we vacate Mr. Duncan's conviction and sentence for obstruction of justice. We affirm Mr. Duncan's remaining convictions and sentences.

**VACATED IN PART; AFFIRMED IN PART**